COMMONWEALTH vs. LAMAR PHILLIPS
(and three companion cases[1]).

Suffolk. January 7, 1992. - July 9, 1992.

Present: LIACOS, C.J., WILKINS, ABRAMS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Probable Cause. Constitutional Law*, Search and seizure, Conduct of gov-
  ernment agents. *Search and Seizure*, Probable cause. *Evidence*, Rele-
  vancy and materiality. *Practice, Criminal*, Dismissal, Conduct of gov-
  ernment agents.

At a hearing on a motion to suppress evidence, the judge properly admit-
  ted testimony with respect to a Boston police department policy to
  "search on sight" certain young, black persons in Roxbury, as well as
  evidence of specific instances of police officers' conducting constitution-
  ally unreasonable "on sight searches," where the evidence was relevant
  to whether the search, in this case, was an "on sight search." [56-57]
The remedy for any prejudice to criminal defendants who were found to
  have been subjected to a constitutionally unreasonable "on sight
  search" pursuant to an official police department policy was not the
  dismissal of the indictments, but rather, the suppression of the evidence
  unlawfully seized as the result of the search. [58-59]

INDICTMENTS found and returned in the Superior Court
Department on August 1, 1989.

A motion to suppress evidence and to dismiss the indict-
ments was heard by *Cortland A. Mathers*, J.

The Supreme Judicial Court on its own initiative trans-
ferred the case from the Appeals Court.

*Thomas J. Mundy, Jr.*, Assistant District Attorney (*Brian
J. Carney*, Assistant District Attorney, with him) for the
Commonwealth.

*Brownlow M. Speer*, Committee for Public Counsel Ser-
vices (*Holly A. Clarke* with him) for Melvin Woody.

---

[1]Two against Melvin Woody and one against Lamar Phillips.

*John E. Conwell* for Lamar Phillips.

O'CONNOR, J. The defendants were indicted for unlawfully carrying a firearm in a vehicle and for the unlawful possession of ammunition. The defendant Woody moved that the court "dismiss the indictments against him or [ ] suppress all evidence obtained pursuant to his stop, detention and arrest on July 21, 1989." With a judge's permission, the defendant Phillips orally joined in Woody's motion. After a hearing on the motion, the judge dismissed all the indictments. The Commonwealth appealed, and we transferred the case to this court on our own initiative. We now reverse the order dismissing the indictments. We remand this case to the Superior Court for the entry of an order suppressing the evidence seized from the vehicle occupied by the defendants on July 21, 1989.

The judge who dismissed the indictments set forth his reasoning as follows:

"On July 21, 1989 just prior to 6 p.m. a Boston Police Department cruiser described as a rapid response car was proceeding on Washington Street and approaching Egleston Square at Columbus Avenue in Roxbury. Traffic was heavy in both directions and moving slowly. A 1986 two tone Nissan Maxima passed the cruiser on Washington Street going in the opposite direction toward Forest Hills. The two officers in the cruiser observed the driver and passenger to be both young and black.

"On the basis of a hunch that the car was stolen the officers determined to reverse their direction and requested a stolen car check. In order to do so it was necessary to proceed some distance toward Egleston Square and make a turn around a traffic circle. As they proceeded one of the officers transmitted as follows:

"'Yah, listen. We got a car at Egleston Square just parked. If you're coming down towards it, it's a Maxima, a gold . . . a gold colored Maxima. You'll see the lights are on. Two kids just got out. They ah . . . they're walking away from it now. We're trying ah

catch up with them. If you can come down and just
ah . . . we might be needing your help in a minute.'

"Substantial inconsistencies in the testimony of later
events occur.

"The officers described pulling their cruiser in behind the
Nissan Maxima, the defendants getting out of the vehicle
and then back into the vehicle. They speak of suspicious body
language once back inside the car on the part of both
defendants.

"The officers testified they approached the Nissan where
both defendants were located and one of them observed a
firearm on the floor of the vehicle protruding from under a
seat.

"The Court is unable to credit this testimony based upon
the statements of lay witnesses, together with the announced
policies of the Boston Police Department and its practices in
this area of the city, which will be subsequently discussed.

"The Court finds that after parking the Nissan both de-
fendants left the vehicle and were walking on the sidewalk at
the corner of Beethoven and Washington Streets, 30-45 feet
from the Nissan, when approached by the officers. The de-
fendants were stopped, searched and placed in the cruiser,
after which a search of the Nissan produced the weapon that
is the subject of these proceedings.

"Since this was a body search and arrest and a vehicle
search without a warrant the burden rests on the Common-
wealth to establish at the outset (and at the very least) an
articulable suspicion that something was amiss and thereaf-
ter that probable cause existed to believe criminal conduct
had occurred. *Commonwealth* v. *Antobenedetto*, 366 Mass.
51 (1974), *Terry* v *Ohio*, 392 U.S. 1 (1968).

"As early as March and not later than May of this year
the Boston Police Department at a level below that of the
Commissioner's Office began the systematic application of a
Policy in the general area of Roxbury that had not previously
been formalized although it may well have had intermittent
use for a much longer time. The Policy was developed in con-

junction with the formulation of a secret list of 'known gang members' which was initially 150 in number but has now grown to around 750.

"The Policy to which reference is made took official form in May when Deputy Superintendent William R. Celester, Commander to 230 officers in the Roxbury District, announced that henceforth all known gang members and their associates (whether known to be gang members or not) would be searched on sight. Celester's announcement was, in effect, a proclamation of martial law in Roxbury for a narrow class of people, young blacks, suspected of membership in a gang or perceived by the police to be in the company of someone thought to be a member.

"Apparently taken aback by these candid pronouncements, the Police Commissioner, on May 23, 1989 issued a memorandum paying due deference to the principles of the first, fourth, sixth and fourteenth amendments [to the United States Constitution] and suggesting the 'Police Department has a profound responsibility to ensure that every citizen is guaranteed the exercise or enjoyment of rights secured by the Constitution and laws of the Commonwealth'. Nothing more than that was done. Mr. Celester's Machiavellian approach to the problems of Roxbury has continued to be implemented.

"As recently as September 10, at 2 a.m. Anthony Thomas, who resides in a van on a lot in Roxbury, was rousted out by uniformed police with flashlights, placed in a police cruiser while his van was searched and then released. The Commonwealth has offered no affidavit or search warrant application to justify such an intrusion.

"I have taken and credit testimony from blacks in the Egleston Square area that they, as individuals and in groups, are forced to open their mouths, placed spread eagle against walls, required to drop their trousers in public places and subjected to underclothing examinations. Deputy Celester stated to a reporter for the Boston Herald that his policy has resulted in 'hundreds of searches but few arrests'.

"The Court finds a tacit understanding exists in the Boston Police Department that constitutionally impermissible searches will not only be countenanced but applauded in the Roxbury area.

"This is a problem which cannot be dealt with on a case by case basis, a fact addressed by the Supreme Court of the United States in *Terry* v *Ohio* 392 U.S. 1, 14 [-15 (1968)]:

'. . . The wholesale harassment by certain elements of the police community, of which minority groups, particularly Negroes, frequently complain, will not be stopped by the exclusion of any evidence from any criminal trial.'

"The United States Supreme Court said in 1891:

'No right is held more sacred, or is more carefully guarded, by the Common Law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' *Union Pac. R.R.* v. *Botsford* 141 U.S. 250, 251 [1891].

## *"ORDER*

"It is ordered that these indictments be dismissed and a copy of this memorandum be furnished to [the] Attorney General. . . for such action as he deems necessary to restrain further unreasonable searches and seizures by the Boston Police Department."

The Fourth Amendment to the United States Constitution proscribes unreasonable searches and seizures. "In order to assess the reasonableness of [a police officer's] conduct [in regard to searches and seizures] as a general proposition, it is necessary 'first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.' *Camara* v. *Municipal*

*Court*, 387 U.S. 523, 534-535, 536-537 (1967). And in justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry* v. *Ohio*, 392 U.S. 1, 20-21 (1968). Despite the absence of probable cause to make an arrest, the Supreme Court in *Terry* upheld a police officer's stopping of the petitioner in that case and searching his outer clothing for a weapon. Articulable suspicious circumstances requiring prompt investigation justified the stop. *Id.* at 22-23. In addition, the Court reasoned that "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime. The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* at 27. The burden to show that a warrantless search was reasonable and therefore not in violation of the Fourth Amendment rests with the government. *Commonwealth* v. *Santiago*, 410 Mass. 737, 744 (1991). *Commonwealth* v. *Antobenedetto*, 366 Mass. 51, 57 (1974).

It is clear that the Commonwealth did not carry its burden to prove to the judge in this case that the police had stopped the defendants and had searched their vehicle lawfully, in keeping with the principles articulated in *Terry* v. *Ohio*, *supra*. On the contrary, the judge found that the police officers approached the defendants not on the basis of an articulable, reasonable suspicion of criminal activity, but, at the most, on the basis of a mere "hunch" that the vehicle had been stolen. The judge also found that the officers stopped the defendants when they were thirty to forty-five feet from their vehicle and were walking away from it, and that the search of the vehicle occurred only after the defendants had been placed in the police cruiser (and therefore

posed no threat to the officers). Therefore, the firearm and ammunition, which the police took from the defendants' vehicle, cannot be used against the defendants at trial. "Courts which sit under our Constitution cannot and will not be made party to lawless invasions of the constitutional rights of citizens by permitting unhindered governmental use of the fruits of such invasions. Thus in our system evidentiary rulings provide the context in which the judicial process of inclusion and exclusion approves some conduct as comporting with constitutional guarantees and disapproves other actions by state agents. A ruling admitting evidence in a criminal trial, we recognize, has the necessary effect of legitimizing the conduct which produced the evidence, while an application of the exclusionary rule withholds the constitutional imprimatur." *Terry* v. *Ohio, supra* at 13.

The Commonwealth argues that the judge's findings were based on irrelevant evidence and that, therefore, the findings should be set aside and the cases should be remanded to the Superior Court for another hearing. Furthermore, that hearing, says the Commonwealth, should be limited to the question whether the seized evidence should be suppressed. The evidence that the Commonwealth characterizes as irrelevant is the evidence concerning a Boston police department policy to "search on sight" all young, black persons in Roxbury suspected of being gang members or of being in the company of a gang member. The Commonwealth also characterizes as irrelevant evidence of other allegedly illegal searches by either the officers who seized the firearm and ammunition in this case or other officers. We do not agree that the challenged evidence was irrelevant.

It is undoubtedly true that, had there been no evidence of an official police policy of "searches on sight," evidence that the officers directly involved in this case or other officers on various occasions conducted unconstitutional searches would not have been relevant. Standing alone, evidence of those isolated events would not have increased the likelihood that the challenged search was unlawful. See *Poirier* v. *Plymouth,* 374 Mass. 206, 210 (1978). However, the evidence of specific

instances of constitutionally unreasonable "on sight searches" tends to support the further evidence of an official policy approving such procedures and, in our view, the evidence of that official policy was relevant. That policy evidence tended to support the eyewitness testimony relied on by the judge to conclude that the search in this case was an "on sight search." The Commonwealth's argument that "other crimes" evidence is ordinarily not admissible in a criminal proceeding, and that therefore, evidence of "other" police conduct similarly should not have been admitted at the motion hearing, lacks merit. Other crime evidence is ordinarily inadmissible against a defendant in a criminal case, not because it is irrelevant, but because "there is the danger that, because a defendant appears to be a bad man capable of, and likely to commit, such a crime as that charged, a jury might be led to dispense with proof beyond a reasonable doubt that he did actually commit the crime charged. Moreover, it is not fair that a defendant in the course of a trial should be called upon to defend himself against accusations not set forth in the indictment." *Commonwealth* v. *Stone*, 321 Mass. 471, 473 (1947).

We have previously considered the relevance of an employer's policy to the question whether an employee had acted in conformance with the policy. Where a plaintiff asserted that a hospital's personnel director had committed an act of racial discrimination, we stated that "evidence which may be relevant to the plaintiff's showing of pretext may include . . . the employer's general practice and policies concerning employment of racial minorities." *McKenzie* v. *Brigham & Women's Hosp.*, 405 Mass. 432, 437 (1989), quoting *Lewis* v. *Area II Homecare for Senior Citizens, Inc.*, 397 Mass. 761, 767 (1986). The same logic applies to the present case. Certainly, having in mind that ordinarily the relevance of evidence is left to the sound discretion of the judge, see *Commonwealth* v. *Marangiello*, 410 Mass. 452, 456 (1991); *Commonwealth* v. *Fontaine*, 402 Mass. 491, 496 (1988), we cannot say here that the judge abused his discretion.

The judge could have, and as we hold, should have, ordered that the evidence obtained as a result of the search of the defendants' vehicle be suppressed. However, the judge did not reach the suppression question. Instead, he dismissed the indictments, and it seems clear from his memorandum of decision that he did so not because the police officers' conduct had irremediably prejudiced the defendants, see *Commonwealth* v. *Manning*, 373 Mass. 438, 443-444 (1977), but as a prophylactic remedy. Thus, the judge described the police department's "search on sight" policy as "a problem which cannot be dealt with on a case by case basis," and he quoted the Supreme Court's statement in *Terry* v. *Ohio*, *supra* at 14-15, that "[t]he wholesale harassment by certain elements of the police community, of which minority groups, particularly Negroes, frequently complain, will not be stopped by the exclusion of any evidence from any criminal trial."

We begin our discussion concerning the proper remedy for the violation of the defendants' Fourth Amendment rights by making an observation about the last quoted statement from *Terry* v. *Ohio*. Read in context, that statement does not suggest that a dismissal of indictments would be an appropriate antidote to pervasive police harassment of minority groups. Indeed, it suggests the opposite. After observing that the exclusionary rule's effectiveness depends on the interest of the police in obtaining convictions, *id.* at 14, the Court makes the point that those officers who engage in wholesale harassment of minority groups are not likely to be deterred by the exclusionary rule because law enforcement is not their primary interest. That being so, dismissal of indictments also would not be an effective deterrent to such conduct.

Any prejudice to the defendants in this case may be remedied by suppression of the ill-gotten evidence. Therefore, as we said in *Commonwealth* v. *King*, 400 Mass. 283, 290 (1987), "we must consider whether, in the absence of prejudice to the defendant[s] or substantial threat thereof, dismissal of these indictments is nevertheless required for prophylactic reasons. Of course, our inquiry in that regard

begins with the recognition that the public has a substantial interest in prosecuting those accused of crime and bringing the guilty to justice." We noted further that "we have never ordered the dismissal of an indictment for misconduct in the absence of prejudice," *id.*, and again in *Commonwealth* v. *Lewin*, 405 Mass. 566, 586 (1989), we said, "We have sometimes remarked that outrageous police conduct, not shown to be prejudicial to a fair trial, may require the dismissal of charges, but we have never dismissed charges in such a circumstance (although we have upheld the suppression of evidence in such situations)." We need not decide whether, in the absence of prejudice or substantial threat of it, an indictment may ever be dismissed because of egregious police misconduct. It is enough for our present purposes to recognize that the deterrent effect of dismissal of these indictments would be little, if any, more than the deterrent effect of suppression of the unlawfully obtained evidence. Of course, it remains to be seen whether, without the suppressed evidence, the Commonwealth can marshal enough other evidence to obtain a conviction on remand. In any event, "[n]othing in the record suggests, nor is there good reason to suppose, that, unless this court provides a prophylactic remedy [beyond suppression], police officers are likely to repeat the type of conduct that occurred in this case." *Commonwealth* v. *King*, *supra* at 292.

The order dismissing the indictments is vacated. These cases are remanded to the Superior Court for the entry of an order suppressing any evidence obtained as a result of the search of the motor vehicle occupied by the defendants on July 21, 1989.

*So ordered.*