Volterra, J.
The defendant is charged with the unlawful possession of a firearm. A firearm was discovered by police officers in the constructive possession of the defendant after a stop of a taxi. The stop was predicated on unfettered discretion vested in police patrol officers by the Boston Police Commissioner to stop taxi cabs in high-crime areas for the purpose of protecting the cab drivers from criminals. The legality of this police policy is the central issue in this case. For the reasons that follow, the defendant’s motion to suppress is allowed.
FINDINGS
On June 13, 1993, Detectives Robert Mermer and Fratalia, who were assigned to the Anti-Gang Unit, *79 were patrolling the streets of Roxbuiy. They had been detailed to work the 5:30 p.m. to 1:00 a.m. shift. On this particular morning, they had also been detailed to an overtime shift from 1:00 a.m. to 5:00 a.m. Detective Fratalia was operating the unmarked cruiser. At approximately 1:15 a.m., the police car crossed Warren Street and entered Quincy Street. The officers observed a taxi owned by the Red and White Cab Company being operated down by Quincy Street. Detective Fratalia and Detective Mermer were on notice that on May 9, 1991, the police commissioner of the City of Boston had issued a special order numbered 91-32 entitled: "Taxi Cab Driver Safety Issues” (Exhibit #1, attached). The order of the police commissioner had been issued after two taxicab robberies that resulted in the homicides of the drivers. The murdered drivers were of Haitian nationality. Soon after the murders, cab drivers, many of whom were of Haitian nationality, demonstrated at police headquarters to demand better protection from the police. The murder and the demonstration resulted in the police commissioner’s order. The order directed the police
. . . [PJatrol and plainclothes personnel are actively encouraged to make frequent stops of taxicabs for the purpose of checking on the operator’s safely. Stops should be conducted when, and wherever necessary, particularly during the evening and early morning hours. Attention should be given to isolated and high-crime areas. Taxicabs will not be detained longer than is necessary to check on the welfare of the operator. Passengers in occupied taxicabs will receive a brief explanation of the purpose of the stop: Driver Safety. A B.P.D. form 1833 will be completed at the time of the check. Most of the information required to complete this form is readily available on the exterior of the cab, the cab driver’s name is not essential.
All personnel are further reminded of the significance of the two amber emergency lights (emphasis in the original) affixed to the roof of taxicabs, directly above the center post, between the front and rear doors. These lights will flash continuously when activated by the driver when he/she is in need of police assistance. Should an officer observe these lights activated, every effort will be made by the officer to stop the taxicab to determine if the driver is in danger or in need of assistance.
Detectives Mermer and Fratalia executing the Commissioner’s directive followed the taxicab down Quincy Street for a short distance. Detective Mermer saw the passenger, who was seated in the rear seat directly behind the cab driver, turn around to look at the unmarked police automobile. Detective Fratalia placed into operation the flashing blue lights of the police vehicle to signal the cab to stop. Detective Mermer then observed the passenger bend forward and go out of view. Detective Mermer inferred that the passenger was bending down to secret something under the seat. In view of the passenger’s furtive movements, Detectives Mermer and Fratalia approached the cab on foot to order the passenger out of the cab. With the aid of his flashlight, Detective Mer-mer observed a pistol under the driver’s seat directly in front of where the passenger had been sitting. Detective Fratalia placed the passenger, Jose Cosme, under arrest. Detective Mermer seized the firearm which was Smith & Wesson 9mm pistol, serial #TFK2608. The pistol was loaded with 10 rounds of ammunition in its clip. The police department had exhausted its supply of B.P.D. form 1833. Detective Mermer merely made out an incident report describing the arrest of Cosme and the seizure of the firearm.
Detective Mermer candidly admitted that he implemented taxicab stops pursuant to the Commissioner’s order based only on his own discretion. He admitted that during the course of any shift, he would observe somewhere between 200-300 cabs. A requirement that he stop all cabs would result in the detective performing no other police duties. Accordingly, Detective Mermer’s discretion is grounded on the circumstances under which he observes the taxicab. The cabs that are singled out for a stop are cabs which are found in high-crime areas. Essentially, each cab stop is merely predicated on “hunch.” Detective Mermer admitted that he had no articulable grounds of suspicion in respect to the cab when it was stopped. At the time that the cab was stopped, there was no signal or other indications from the cab driver that assistance was required.
DISCUSSION
The defendant challenges on both state and federal constitutional grounds the legality of the stop of the cab and the subsequent seizure of the firearm. Specifically, defendant claims that the stop and the seizure was a violation of his Fourth Amendment right against unlawful searches and seizures.
The question presented is whether the Boston Police procedure of randomly stopping cabs in order to check on the operator’s safety, referred to as “Operation Taxi,” is an unconstitutional violation of the defendant’s Fourth Amendment Rights. In order for an individual to assert a Fourth Amendment claim, he or she must establish that they had a legitimate expectation of privacy in the area searched. As a matter of state constitutional law, Massachusetts has adopted the automatic standing rule of Jones v. United States, 362 U.S. 257 (1960). The automatic standing rule provides that “[w]hen a defendant is charged with a crime in which possession of the seized evidence at the time of the contested search is an essential element of guilt, the defendant shall be deemed to have standing to contest the legality of the search and seizure of that evidence.” Commonwealth v.Amendola, 406 Mass. 592, 601 (1990). Massachusetts departs from the federal rule announced in United States v. Salvacci, 448 U.S. 83 (1980), in which the United States Supreme Court abandoned the automatic standing rule. Defendant has been charged with *80 possession of a firearm, therefore, he has automatic standing to contest the legality of the seizure. Thus a privacy analysis is not necessary.
This case is a warrantless stop. Massachusetts follows the constitutional standards of Terry v. Ohio, 392 U.S. 1 (1968), in determining whether a brief stop of an individual and a limited search without a warrant is constitutional. Commonwealth v. Silva, 366 Mass. 402, 406 (1974). Before a police officer may initiate a Terry stop, his actions must “be based on specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer’s experience.” Id. This standard is most commonly referred to as “reasonable suspicion”; a mere “hunch” or good faith is not enough to justify such a stop. Even if the stop was permissible, the search, or “frisk,” must be justified under the circumstances. Terry, 392 U.S. at 21. A policeman is determined to have reasonable suspicion to stop and frisk an individual if “a reasonably prudent man in the policeman’s position would be warranted in the belief that the safety of the police or that of other persons was in danger.” Silva, 366 Mass. at 406.
Massachusetts applies the same stop and frisk analysis in upholding the stopping of an automobile to conduct such an inquiry. Commonwealth v. Riggins, 366 Mass. 81 (1974). There may be a Terry stop of an automobile if the police have a reasonable suspicion that the driver or passenger is engaged in criminal activity, and a Terry stop search may extend into the interior of an automobile so long as it is limited in scope to a protective end. Silva, 366 Mass. at 408 (citing Commonwealth v. Hawkes, 362 Mass. 786 (1973)).
The Supreme Judicial Court used the Terry stop and frisk analysis when it held that another Boston Police procedure was an unconstitutional violation of one’s Fourth Amendment Rights. Commonwealth v. Phillips, 413 Mass. 50 (1992). This procedure requires that all gang members and their associates (whether known to be gang members or not) be stopped and searched on sight by the Boston Police. Id. at 53. This policy was developed in conjunction with the formulation of a secret list of “known gang members”; the list contained the names of. about 150 people. This policy was held to be unconstitutional. Thus, the only basis a police officer would have for stopping someone in such a case would be that they might be a gang member, or that someone is with a person “thought" to be a gang member. This policy led to the searches of hundreds of young black men in the Roxbuiy and Dorchester area, but few arrests. Id. The search of the car in Phillips was also unreasonable since the defendant was stopped 30-45 feet away from the car, thus, there was no legal justification. Id. at 55.
The random stopping of young black men in Roxbuiy and Dorchester can easily be analogized to the random stopping of cabs. The purpose of the “stop on sight” policy was for protection of the public as well as to prevent these gang members from killing each other. The purpose of “Operation Taxi” was to check on the safety of tire cab operator. Defendant also analogized “Operation Taxi” to a roadblock. The purpose of the roadblock is to stop any drivers which the police believe are intoxicated, and therefore is for the safety of the public as well as the driver. Although reasonable suspicion is not necessary for such stops, there are specific constitutional requirements which must be adhered to. Commonwealth v. McGeoghegan, 389 Mass. 137, 144 (1983). These roadblocks must meet standard, neutral guidelines conducted pursuant to a plan devised in advance by law enforcement supervisory personnel. Id. The decision to stop and the location of the stop must not be left up to the discretion of the police officers, but must be based on selective enforcement identifiers in strict compliance with the guidelines. Id.
The police officer who stopped the cab carrying the defendant pursuant to “Operation Taxi” testified on direct examination that he did not and could not stop every cab he passed each night. He testified that he only stopped those cabs he found in high-crime areas, where it was particularly dark and isolated, and where he sensed possible danger. Thus his decision to stop was at most predicated on a “hunch.”
“Operation Taxi” offends the Terry reasonable suspicion standard because the decision to stop is left to the unbridled discretion of the police officer. Here there was no reasonable suspicion, but merely a “hunch.” Moreover, “Operation Taxi” does not pass constitutional muster as a roadblock because it is not conducted in accordance with the comprehensive guidelines from McGeoghegan. McGeoghegan requires that police give the public advance notice that a roadblock has been set up. The passengers of cabs are given no notice that the car that they are driving in is subject to random stops by the police. Arguably, if the cabs had printed on the outside of the cab doors some type of warning, such as ‘To all passengers: Please be advised that this cab is subject to stops by the Boston Police to check on the safety of the driver. If you do not consent to such a stop, do not enter the cab,” this stop might have been lawful. Here, the decision to stop is the product of the arbitrary and unbridled discretion of the police officers. There were no standards or guidelines given regarding the stop of cabs. The police officer testified on cross-examination that he was never given any training as to the implementation of “Operation Taxi.” Thus, no standards were ever developed.
I determine that the warrantless stop of the cab was unlawful. Accordingly, the defendant’s motion to suppress is ALLOWED.
ORDER
For the forgoing reasons, the motion to suppress is ALLOWED.