Toomey, J.
INTRODUCTION
Defendant has moved to suppress items seized by State Police Troopers in the course of their stop of a vehicle in which defendant was a passenger. The motion asserts that the stop was pre-textual and based upon an impermissible “profile” rationale, that the frisk of defendant’s person and the seizure of the contents of a zipped bag was without lawful justification and that statements obtained from defendant were both “fruits” of the unlawful stop and violative of Miranda/voluntariness principles.
This court heard no evidence with respect to statements, if any, uttered by defendant and will not, accordingly, address the admissibility thereof. Further, this court is unpersuaded by the suggestion that the initial stop was pre-textual or founded upon a theoretical assumption that a vehicle belonging to a certain class of conveyance (commercial van), bearing a certain ethnically identifiable “logo” (hispanic) and travelling in a certain area (an interstate highway between Connecticut and northeastern Massachusetts) is probably engaged in controlled substance offenses. The evidence at bar fails to support the defense contentions with respect to either the pretext or the profile claim.
The evidence does, however, firmly underpin the defense argument that the search and seizure that produced the controlled substance lacked the requisite probable cause and must, for that reason, result in a suppression of the items thereby obtained. Accordingly, and for the reasons stated infra, the motion to suppress will be allowed.
FACTS
On October 13, 1994, Massachusetts State Police Trooper Skelly (“Skelly”) was patrolling the northbound lane of Route 495 in Berlin, Massachusetts. He was uniformed and riding in a marked cruiser. His attention was drawn to a van proceeding northbound in the far left lane. Skelly noted that there were no other motor vehicles in lanes to the right, and yet the van continued to travel in the left-most lane for a period of approximately thirty seconds and for a distance of approximately one-half mile.
Skelly activated the blue flashing lights on his cruiser, a signal to the van to pull to the right and stop. Skelly observed a passenger (the defendant), who was seated on the second (of four) bench seat behind the front bucketseats, bend down out of his (Skelly’s) view immediately after the blue lights were triggered. The van drove to the right and stopped.
Skelly, on foot, approached the van from its right side, opened the sliding right rear door and ordered defendant to exit.[1] Defendant complied and Skelly pat-frisked his person.[2] That frisk resulted in nothing of significance. Skelly asked defendant for identification. Defendant produced a work permit (“green card”), two social security cards (bearing identical numbers) and an identification card. The latter was of suspect origin in that it did not bear the embossed lettering Skelly expected to find on such a document.
From his position outside the open slider, Skelly observed a black bag resting under the first bench seat and an aqua zippered bag under the second bench seat. Skelly reached into the van and seized the aqua bag.[3] There was substance to the contents of the bag, although it did not feel “heavy.” Skelly knew from its weight that “something” was inside. He unzipped the bag, looked inside[4] and observed, on the bottom of the bag, a folded blanket, on top of which was a towel, on top of which was a manila envelope. The flap of the envelope was fastened by an inset clip with the result that the envelope was closed.
Skelly extracted the envelope from the bag and felt its contents. The feel was similar to that Skelly had experienced in 1990 when he found, in a similar manila envelope, heroin packets wrapped in duct tape. His “feel” of the envelope convinced Skelly that no firearm, knife or other weapon was inside, but the “feel” did suggest to him that drugs “could be” in the envelope. The object inside, the texture of which was undeterminable, was, according to his “feel,” seven to eight inches in length, oblong in shape, and not rigid in substance. Its “squishy” feel was “consistent with the packaging of controlled substances.”
Trooper Skelly unclasped the envelope and extracted two duct tape-wrapped packages. His training and experience included instances in which duct tape had been employed to wrap controlled substances and, thus informed, he ripped the duct tape and exposed clear envelopes (baggies) in which white powder could be seen. The envelopes consisted of one thousand packages which were subsequently analyzed and found to contain heroin.
DISCUSSION
Having observed the van being operated in a manner prohibited by G.L.c. 89, §4B (“ . . . the driver . . . shall drive in the lane nearest the right side of the way except [in circumstances not pertinent here]”), Trooper Skelly was warranted in signalling to the vehicle to stop. Commonwealth v. Figueroa 18 Mass.App.Ct. 967 (1984). He was also acting lawfully when, in response to defendant’s conduct — ducking out of sight immediately upon the activation of Skelly’s blue flashing lights — he became concerned for his personal safely, ordered defendant to exit the van and pat-frisked the defendant to determine whether or not defendant was armed. Commonwealth v. Santiago, 30 Mass.App.Ct. 207, 209-11 (1988). In all respects, the conduct of Trooper Skelly, to this point, was in full compliance with constitutional demands. His subsequent actions, although undertaken in good faith, were not.
*378 A. THE TROOPER’S ACTIONS CONSTITUTED A SEARCH FOR EVIDENCE; EVEN IF THEY WERE A SELF-PROTECTIVE FRISK, THEY WERE UNSUPPORTED BY SPECIFIC AND ARTICULABLE FACTS AS REQUIRED BY TERRY.
Although assured that the defendant carried no weapons on his person and was at a distance from the van,[5] Skelly nonetheless entered the van and seized the aqua bag. Given the minimally suspicious act of “ducking down,” the wholly unproductive pat-frisk and defendant’s disconnection from the van and its contents, Skelly’s entry into the van and seizure of the aqua bag, are more accurately characterized as a “search for evidence” than as acts “for the protection of the officer.” Commonwealth v. Figueroa, 18 Mass.App.Ct. 967, 968 (1984). So too, his unzipping of the bag — which, significantly, he had not palpated to ascertain whether any weapons might have been inside — was a search for evidence and not accomplished in the interests of his personal well-being. And, when Skelly unclipped the manila envelope — after his exterior “feel” suggested only that its contents “could be” or were “consistent with the packaging of controlled substances”[6] — he was certainly engaged in a search for evidence.
The Commonwealth nonetheless argues that the seizure of the aqua bag and the unzipping thereof were acts accomplished for the protection of the Trooper and were, accordingly, constitutionally compliant. That proposition is not sound because, as noted by Terry v. Ohio, 392 US 1 (1968), and its progeny,[7] an intrusion for the protection of an officer must be based on “specific and articulable facts” demonstrative of the danger. Id. at 20-21. Thus, even if we accept the Commonwealth’s premise — that the Trooper’s actions were not for an evidentiary purpose but were motivated by self-protective considerations — its conclusion is invalid because the Trooper’s concern for his safely, vis-a-vis the aqua bag, was no more than a hunch, an unarticulated suspicion. Such a non-particularized suspicion is insufficient to warrant intrusion into the van or into the bag. Commonwealth v. Phillips, 413 Mass. 50, 55-56 (1992); Commonwealth v. Ferguson, 410 Mass. 611, 615 (1991).
B. THE SEARCH, WHICH RESULTED IN THE SEIZURE OF THE CONTROLLED
SUBSTANCES, WAS UNDERTAKEN WITHOUT PROBABLE CAUSE AND WAS, ACCORDINGLY, UNCONSTITUTIONAL.
Further, even assuming, arguendo, that the intrusion into the van and into the bag were supported by a constitutionally adequate, specifically articulated foundation, the unclasping of the envelope was patently without such support. According to Trooper Skelly, his “feel” of the envelope eliminated any concerns, articulable or not, that he may theretofore have harbored -with respect to threats to his safety from the envelope. Given that elimination, the opening of the envelope became, indisputably, a search for evidence. Such a search will survive constitutional challenge only if it is based upon probable cause (assuming, again arguendo, that exigent circumstances were present to excuse the absence of a warrant). Commonwealth v. Antobenedetto, 366 Mass. 51, 53 (1974). There was, at bar, no such probable cause because, as conceded by Trooper Skelly, the “feel” of the envelope suggested only that controlled substances “could be” in the envelope and that the envelope’s contents were only “consistent with the packaging of controlled substances.” In sum, there was just a possibility that drugs were in the envelope, a circumstance that fails the constitutional litmus.
CONCLUSION
If Trooper Skelly’s post frisk conduct was for the purpose of self protection, it was undertaken without the requisite articulable suspicion of danger. If his conduct was for-the purpose of searching for evidence, it was undertaken without the requisite probable cause. In either event, his seizure of the controlled substances occurred in circumstances incompatible with the demands of the Fourth Amendment to the United States Constitution and Article XIV of the Massachusetts Declaration of Rights. The Motion to Suppress the items thus seized will be ALLOWED.

The occupants of the van consisted of four persons: the operator, a passenger (front bucket right), a passenger (first bench right) and defendant (second bench middle).

Skelly testified that he opened the slider, issued the exit order and pat-frisked defendant in the interests of his (Skelly’s) safety. The Court credits that testimony.

The aqua bag was soft sided, not rigid, and was constructed of nylon. It measured approximately 8 inches in width, 14 inches in length and 16 inches in height.

Skelly testified that he peered into the bag to determine whether or not it contained a weapon. He conceded, however, that the only factor indicative of the presence of a weapon was defendant’s “ducking down” when Skelly’s blue lights were activated. Skelly had not palpated the aqua bag before unzippering it.

The precise distance does not appear from the record but we may assume that, because the exit order was voiced by Skelly in order to separate defendant from any weaponry in the van, defendant was indeed so separated during and after the pat-frisk.

It is beyond cavil that the opening of the envelope was not a self-protective act by Skelly because he had concluded prior thereto and from his “feel” of the envelope that it contained no weapon.

See cases cited at Smith, Criminal Practice and Procedure, 30 Mass. Prac. §278.