Houston, J.
The defendants, Daniel J. Callahan III (“Callahan”) and Roseanne McNair (“McNair”), have been indicted for various drug offenses.[1] These indictments arose from the warrantless arrests of Callahan and McNair and search of Callahan’s vehicle in Brain-tree, Massachusetts on August 9, 1998. During this search, police seized evidence including packets of heroin and syringes. McNair and Callahan have filed separate motions to suppress the evidence seized during this search. The court conducted an eviden-tiary hearing on May 12, 1999, and heard testimony from Detective Mark Foley (“Foley”) of the Quincy Police Department and Detective Kevin McDonough (“McDonough”) of the Braintree Police Department. Upon consideration of the testimony from these witnesses, I find the search that was conducted was unlawful. Therefore, for the reasons set forth herein, I hereby ALLOW the defendants’ motions to suppress.
Based upon the credible testimony of the witnesses and reasonable inferences therefrom, I make the following findings of fact.

FINDINGS OF FACT

At approximately 11:00 AM on August 9, 1998, Detective Foley of the Quincy Police Department, who was assigned to the Norfolk County District Attorney’s Drug Task Force (“Drug Task Force”) but was not on duty at this time, was in his personal vehicle (a pickup truck) near Granite Street in Quincy, Massachusetts. Transcript of Oral Argument on Defendants’ Motions to Suppress (May 12, 1999) at 6 (hereinafter “Transcript”).[2] Detective Foley observed Callahan operating a brown Volkswagen Jetta in a supermarket parking lot; McNair was the only passenger in the car. Detective Foley’s attention was first drawn to the vehicle because he had been involved with several arrests of Callahan on prior occasions. Solely for this reason, Foley “decided to follow him and just see if anything happened.” Transcript at 11-12. Foley observed McN-air exit the Jetta, use an ATM machine at the supermarket, and return to the vehicle. The vehicle left the supermarket lot, and Foley decided to continue to follow the vehicle, “[j]ust to see what the two occupants were up to, if anything.” Transcript at 9-10.[3]
Detective Foley followed Callahan and McNair from Quincy to Brockton, Massachusetts, via Route 24. Foley observed nothing suspicious during the trip and Callahan drove in a normal fashion. Still, Foley decided to contact other members of the Drug Task Force, Detectives McDonough and Pamela Creed, on ' his cellular telephone to ask them to assist him in his surveillance of Callahan and McNair. Like Foley, both McDonough and Creed were off duty on that date, and were in fact each at their respective homes when Foley contacted them. Detective Foley testified that the reason he requested assistance was that he knew Brockton to be a “source city” for narcotics; however, Foley placed the call for assistance while Callahan and McNair were still travelling on Route 24 and had not yet reached Brockton. Transcript at 11.
After Callahan and McNair reached Brockton, Detective Foley observed them drive to the downtown area and begin driving through several streets, circling the same areas several times. On three occasions, Callahan stopped the vehicle, used a pay telephone briefly, and then continued driving around the streets again. At this point, Detective McDonough arrived and took over the surveillance.[4] McDonough was driving an unmarked police cruiser. McDonough first observed Callahan’s vehicle travelling north on North Main Street in Brockton. Callahan turned into a side street and pulled to the side of the road near the intersection. McDonough stopped approximately twenty to thirty feet away. The area where they were stopped was a well-traveled, mixed commercial and residential area.
At some point, Callahan exited the vehicle and approached a male on a bicycle,[5] who had arrived at the intersection. McDonough did not see this male approach the intersection and did not see where he went afterward. McDonough did not know him and had never seen him before or since.[6] McDonough observed Callahan and the other male have a brief conversation, though he was not close enough to hear what was said. This conversation ended with the two shaking hands and the other male pedaling away.[7] McDonough’s view of the two was clear and unobstructed. He did not observe any sort of exchange or transaction that appeared to be a drug deal. He saw no money or physical object being exchanged. Transcript at 66. The encounter between Callahan and the male on the bicycle occurred in a busy, highly public area of the city of Brockton in the middle of the day. Transcript at 65-67. McDonough observed nothing *665 that could be described as furtive glances by either Callahan or the other male during their meeting. There was nothing unusual or suspicious in the way Callahan returned to his vehicle. Similarly, there was nothing unusual or suspicious in the way the other male rode away. Transcript at 67-68. McDonough testified that he believed the interaction to have been a drug transaction, a belief he based solely on the brevity of the encounter and his training and experience. Transcript at 68. McNair remained in the vehicle the entire time, and McDonough observed her to have had no contact with the male on the bicycle.
Following this meeting, Callahan pulled back into traffic and proceeded to a Wal-Mart on Route 28 in Avon. Callahan entered the parking lot and parked his vehicle in a space in the lot. McDonough followed them to the lot, and parked about 800 feet away. There were approximately 100 cars in the lot at the time. Most were parked close to the store, but Callahan parked in an empty area of the lot away from the store. Callahan and McNair remained in that spot for about ten or fifteen minutes. Except for one trip by Callahan to the trunk of the car, the two remained inside the vehicle. The vehicle then left the parking lot, followed by McDonough, Foley, and Creed (who had, by this point, joined in the surveillance), all in separate vehicles. The caravan proceeded from the parking lot, onto Route 28 North, then Route 24 North, and then Route 128. There was nothing unusual in the way Callahan was driving on the trip away from Brockton. Transcript at 70. Callahan, followed by the rest, left Route 128 and eventually proceeded to Washington Street in Braintree. McDonough decided to stop Callahan’s vehicle. Because Callahan was, at this time, in Braintree, and because McDonough was the only Braintree police officer in the surveillance caravan, the decision to stop Callahan was McDonough’s decision. Transcript at 71. The reason McDonough decided to stop the vehicle was not to conduct a threshold inquiry, but to effectuate an arrest of Callahan and McNair, on the belief that they had purchased drugs in Brockton and used the drugs in the Wal-Mart parking lot. Transcript at 71. Detective Foley signaled a state police trooper who happened to be in the area to stop Callahan’s vehicle.[8]
After Callahan stopped his vehicle, the detectives exited their vehicles. Foley and the trooper approached Callahan, while McDonough and Creed approached McNair. Foley identified himself as a police officer,[9] asked Callahan to exit the vehicle, and immediately informed Callahan of his Miranda rights. Similarly, Detective Creed immediately informed McNair of her Miranda rights. Foley testified that he asked Callahan if Callahan was in possession of any heroin, and Callahan responded he had heroin in his sock. According to Foley’s testimony, Callahan then consented to a search of his person, and further stated that he had heroin in the trunk. No heroin was found on Callahan’s person. Transcript at 16-17. Foley and the other detectives on the scene then conducted a search of Callahan’s vehicle, including the trunk. Foley found heroin, packaged in about nine yellow glassine bags, in a green duffel bag in the trunk. Callahan and McNair were then placed under arrest and transported to the Braintree Police Station. In addition to the heroin that Foley found in the trunk, also found were several syringes and seven bags of heroin in McNair’s pocketbook. A state police dog found more heroin in a cigarette box in the console.

RULINGS OF LAW

The Fourth Amendment to the United States Constitution and Article Fourteen of the Declaration of Rights to the Massachusetts Constitution secure for the people the right to be free from unlawful searches and seizures. U.S. Const. amend. IV; Mass. Const. art. XIV; Mapp v. Ohio, 367 U.S. 643, 655 (1961) (declaring that Fourth Amendment applies to the states through the Fourteenth Amendment). Both constitutional provisions serve to bar the use of evidence procured through illegal searches and seizures. Weeks v. United States, 232 U.S. 383, 39 1-92 (1914) (discussing Fourth Amendment prohibitions); Commonwealth v. Upton, 394 Mass. 363 (1985) (Article Fourteen bars use of evidence seized through illegal search and seizure). The main purpose behind this exclusionary rule is to deter unlawful police conduct, preserve the integrity of the judicial process, and preclude the prosecution from benefiting from unconstitutional police activity.
Warrantless searches are per se unreasonable unless they fall within one of the few narrowly-drawn exceptions to the warrant requirements. Katz v. United States, 389 U.S. 347, 357 (1967); Commonwealth v. Forde, 367 Mass. 798, 800 (1975). The Commonwealth has the burden of showing that the search, and any resulting seizure, falls within the narrow class of permissible exceptions. Commonwealth v. Phillips, 413 Mass. 50, 55 (1992). See also Commonwealth v. Santaliz, 413 Mass. 238, 240 (1992) (“Where, as is the case here, an arrest and attendant search are made without a warrant, the Commonwealth bears the burden of establishing that the actions of the police met constitutional standards”).
The stop of a motor vehicle is a seizure within the meaning of the Fourth Amendment and Article Fourteen. United States v. Brignoni-Ponce, 422 U.S. 873 (1975); Commonwealth v. Alvarado, 423 Mass. 266, 268 (1996). This case involves the warrantless stop and search of Callahan’s car and the warrantless arrests of Callahan and McNair. The constitutionality of these actions by the police turns on the legality of the stop. For the reasons discussed below, the court rules that the police officers did not have sufficient justification to stop Callahan’s vehicle. Generally, because of the limited nature of the intrusion, stops of moving vehicles do not require the traditional showing of probable cause. Brignoni-Ponce, 422 U.S. 873; Com *666 monwealth v. Wren, 391 Mass. 705, 707 (1984). Thus, a police officer may stop a vehicle to conduct a threshold inquiry “if he has a reasonable suspicion that the occupants have committed, are committing, or are about to commit a crime.” Wren, 391 Mass. at 707. In addition, the officer’s suspicion “must be based on specific, articulable facts and reasonable inferences drawn therefrom. A hunch will not suffice.” Id. However, while the reasonable suspicion standard is applied to cases where the police seek to conduct a threshold inquiry of the occupants of a vehicle, that is not what occurred in the present case. Here, Detective McDonough, the person on whom rested the ultimate decision whether or not to stop the vehicle when it was in Braintree, decided to stop Callahan in order to effectuate an arrest.[10] In order to place a person under arrest, the police must satisfy the probable cause standard. United States v. Watson, 423 U.S. 411 (1975); Commonwealth v. Lewis, 346 Mass. 373, 383 (1963). Thus, the validity of the stop turns on whether the police possessed probable cause to arrest Callahan and/or McNair. Commonwealth v. Kennedy, 426 Mass. 703, 705 n.1 (1998). For the reasons discussed below, the court finds that they did not.
Probable cause to arrest exists where the facts and circumstances in the arresting officer’s knowledge and of which he has reasonably trustworthy information are sufficient to warrant a person of reasonable caution in believing that an offense has been or is being committed. Gerstein v. Pugh, 420 U.S. 103 (1975); Santaliz, 413 Mass. at 241. The test is an objective one. Commonwealth v. Franko, 419 Mass. 635, 639 (1995).
The facts here indicate that the police lacked probable cause to arrest either Callahan or McNair. The collective observations of Detectives Foley and McD-onough merely establish the following: McNair used an ATM machine. Callahan and McNair drove from Quincy to Brockton, committing no civil motor vehicle infractions. They drove around Brockton neighborhoods and used three public telephones for brief telephone calls. Callahan met a male on a bicycle, in a busy public area of Brockton in broad daylight, spoke with him, and shook his hand. Callahan and McNair sat in a Wal-Mart parking lot for a short time before driving to Braintree. These observations fall far short of establishing probable cause. In fact, they are notable for what they do not include. Neither of the police officers reported furtive gestures or glances while Callahan met the male on the bicycle. There is absolutely no suggestion in the testimony of anything being handed to anyone during that encounter, even though the officer making the observations was close at hand. The male on the bicycle simply disappears from the story, with no one making any effort to see that he was apprehended or questioned in any way. Neither Callahan nor the male on the bicycle made a hasty departure from the scene of the alleged transaction. The officers made no observation of any drug use by the pair while they were in the Wal-Mart parking lot.
Instead of relying solely on the facts in evidence to justify the stop, the Commonwealth seeks to use the “training and experience” of the police officers, their conclusions, and their perception of Brockton as a “source city” for narcotics to reinforce its conclusion that Callahan and McNair possessed drugs.[11] The court finds that this is not sufficient to satisfy the Commonwealth’s burden. Certainly, “a police officer may rely on his training and experience to draw inferences and make deductions that might well elude an untrained person.” Commonwealth v. Garcia, 34 Mass.App.Ct. 645, 650 (1993). However, in this case the observations were so innocuous as to be insufficient. This case is analogous to Garcia. Id. In Garcia, after making a lawful stop of an automobile, the officer saw an empty transparent glassine baggie in the vehicle. Id. at 647. Based on his training and experience, he believed the baggie was of a type used for unlawful purposes, namely for drug distribution. Id. He then ordered the occupants to exit the vehicle, conducted a pat frisk, and searched the vehicle for drugs, which he found. Id. at 647-48. One of the passengers admitted the drugs were his. Id. at 648. The Appeals Court held that the officer lacked probable cause to search the vehicle, because the only factual observation he made prior to the search was of an empty glassine baggie. Id. at 650. Observations of such benign objects, capable for lawful as well as unlawful uses, was insufficient to establish probable cause to search the vehicle, even when coupled with the officer’s training and experience in narcotics investigations. Id. at 651-52. Similarly, in this case the observations made by Foley and McDonough were of entirely innocuous activity. Like the benign object observed in Garcia, there is nothing inherently suspicious about going to an ATM, driving to Brockton, making telephone calls, and meeting someone on a bicycle. Adding the officers’ training and experience can only elevate the level of suspicion into a hunch. A hunch is far too little on which to justify a stop of a motor vehicle. Phillips, 413 Mass. at 55. The detectives have failed to satisfy the court that their training and experience allowed them to deduce that they had observed a drug transaction in what, to the untrained eye, was entirely innocent activity.[12] See also Commonwealth v. Alvarado, 420 Mass. 542, 547, 549 (1995) (viewing an object which may be used for lawful as well as unlawful purposes not sufficient to provide probable cause to arrest individual possessing object; officer’s training and experience not sufficient to overcome this deficiency). The Commonwealth has cited no cases to the contrary.
The Commonwealth also relies on Commonwealth v. Kennedy, 426 Mass. 703, 710 (1998), for the proposition that the absence of an observation that an object was exchanged during the encounter with the male on the bicycle is not fatal to the Commonwealth’s case. In Kennedy, the Supreme Judicial Court refused to adopt a per se rule that an officer, in a situation similar to this case, must actually see an object exchanged in *667 order to have probable cause to arrest. Id. However, Kennedy is distinguishable from this case. In Kennedy, the officer making the observations witnessed an exchange of something, without being able to identify what it was that had been exchanged. Id. at 707. The defendant appeared “nervous and fidgety”; “furtive gestures bespoke a drug sale.” Id. at 704 and 705 n.2. The defendant’s interaction with the dealer appeared to be a crime itself, not a mere “incidental association.” Id. at 709. In contrast, in this case there were no observations of any sort of anything being exchanged or of any furtive glances. The only physical contact observed was that Callahan and the other male shook hands, an observation that the officer did not think significant enough to place in his police report. The court in Kennedy observed that the gap in the evidence (i. e., not being able to identify exactly what was exchanged) “undoubtedly weakens the case here for probable cause.” Id. at 710. The gap in this case is even wider and is fatal to the Commonwealth’s assertion that probable cause existed at the time of the stop.[13] For these reasons, I find that the police lacked sufficient justification to stop Callahan’s motor vehicle.
Because the stop was unlawful, all evidence derived directly from the stop must also be suppressed.[14] In its memorandum in opposition to the defendants’ motions to suppress, the Commonwealth does not argue against the application of the “fruit of the poisonous tree” doctrine; nor could it. The stop led to the questioning of Callahan and McNair. This questioning, according to Detective Foley’s testimony, resulted in Callahan declaring that he had heroin in his sock (which turned out to be not true) and also in the car trunk (which proved to be true). Therefore, the illegal stop directly led to the search of the car and seizure of the drugs and other evidence.
The “fruit of the poisonous tree” doctrine states that indirect as well as direct products of a police officer’s unlawful conduct may be suppressed. Wong Sun v. United States, 371 U.S. 471, 484 (1963); Commonwealth v. Fredette, 396 Mass. 455, 458-59 (1985). The issue is whether the evidence has been obtained by exploiting the illegality or by means sufficiently distinguishable to dissipate the taint. Fredette, 396 Mass. at 45 8-59. In this case, after considering all the evidence presented at the motion to suppress hearing, the court finds that none of the relevant exceptions to the fruit of the poisonous tree doctrine apply.
There are no facts in the record to indicate that the evidence would inevitably have been discovered. Nor are there any facts to suggest that the police obtained any of the evidence through an independent source. The only exception that is relevant to this case is the attenuation of the taint doctrine. Under this theory, in some circumstances the connection between the improper conduct and the evidence derived from that conduct may become so attenuated as to dissipate the taint, and the deterrent effect of exclusion no longer justifies its social cost. Fredette, 396 Mass. at 459. In making this determination, the court is guided by three factors:(l) the temporal proximity of the illegal conduct to the obtaining of the evidence, (2) the presence of intervening circumstances, and (3) the nature of the misconduct. Commonwealth v. Manning, 44 Mass.App.Ct. 695, 698(1998). The burden of persuasion rests with the Commonwealth to show that evidence obtained after the unlawful conduct is untainted. Commonwealth v. Caso, 377 Mass. 236, 243 (1979).
The court concludes that the Commonwealth has not sustained its burden. The evidence in this case was seized immediately following the unlawful stop of Callahan’s vehicle. There was no “break in the stream of events.” Commonwealth v. Smith, 412 Mass. 823, 830 (1992). While both defendants were given Miranda warnings immediately after the stop, Miranda warnings alone do not necessarily purge the taint of the illegal stop. Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982). They are one of many factors to be considered in evaluating the legality of a stop. Given the close temporal proximity of the illegal stop, the giving of the Miranda warnings, and Callahan’s statements, as well as the circumstances that existed at the scene of the stop — the number of police officers and the police caravan that converged on the defendants — the court finds that the giving of Miranda warnings was not sufficient to attenuate the taint of the unlawful stop. Cf. Bradshaw, 385 Mass. at 258 (confession not tainted by illegal arrest where defendant was given Miranda warnings twice before confession, and over an hour elapsed before the statement was made). Furthermore, the purpose of the stop was to obtain precisely the evidence that the defendants seek to suppress. The Commonwealth has failed to demonstrate that the connection between the misconduct and Callahan’s statements, which led to the Search of the vehicle, is sufficiently attenuated that the statement cannot be said to be the fruit of the unlawful stop and arrest. See Commonwealth v. Hine, 393 Mass. 564, 570 (1984). Callahan’s statements were fatally infected by the violations of the Fourth Amendment and Article Fourteen. See Commonwealth v. Fielding, 371 Mass. 97, 113 (1976). Those statements, and the drugs and other evidence seized, were the direct products of the unlawful stop and exploitation of that illegality, and must be suppressed.

ORDER

For the foregoing reasons, it is hereby ORDERED that the defendants’ motions to suppress evidence be ALLOWED.

 Callahan was indicted for possession with intent to distribute heroin, in violation of G.L.c. 94C, §32(a); possession with intent to distribute a controlled substance having one or more prior convictions of specified drug offenses, in violation ofG.L.c. 94C, §32(b); and possession ofa hypodermic syringe, in violation of G.L.c. 94C, §27. McNair was indicted for possession of heroin, in violation of 94C, §31; and possession of a hypodermic syringe, in violation of G.L.c. 94C, §27.

 There was a discrepancy in the testimony regarding the vehicle Detective Foley was driving. Detective Foley testified *668 that he was In a pickup truck. Transcript at 9. Detective McDonough, though, the only other person to testify at the hearing, stated that Detective Foley was driving a maroon car, and not a pickup truck. Transcript at 58.

 A default warrant had been issued against McNair by the Dorchester District Court. However, none of the officers involved in the surveillance of Callahan and McNair knew of this at the time of the surveillance. The default warrant played no role in the decision to surveil the vehicle Or in the subsequent arrests of Callahan and McNair.

 McDonough took over the surveillance because Foley was concerned about being spotted by Callahan and McNair, as he had been following them for quite some distance. There is no evidence that Callahan and McNair actually knew they were being watched.

 McDonough emphasized in his testimony his belief that the male was Hispanic.

 Indeed, McDonough was unable even to recall what the male was wearing. His only observations about the male’s physical appearance were that he was Hispanic (a conclusion McDonough based on his skin color) and looked like he was in his twenties. Transcript at 64.

 McDonough’s observation that Callahan and the other male had shaken hands at the conclusion of the conversation was not stated in McDonough's police report. In fact, according to McDonough’s testimony, the police report contains no reference whatsoever to any sort of physical contact between Callahan and the male on the bicycle. Transcript at 66.

 The reason the trooper was used to effectuate the stop was because Foley and Creed were in their personal vehicles and McDonough’s police vehicle was unmarked. If Callahan’s vehicle were to fail to stop, it would be unsafe to pursue the vehicle in an unmarked police cruiser. Thus, the marked state police vehicle was used to stop Callahan.

 Because Foley was not on duly that day, he was unarmed and did not have his badge with him. He identified himself as a police officer simply by stating, “Quincy Police.”

 On this point, there was discrepancy in the testimony. Detective Foley testified that the purpose of the stop was simply to conduct a threshold inquiry. See transcript at 29. However, in light of the court’s finding that the ultimate decision to stop the vehicle rested with Detective McDonough, it is McDonough’s reason for the stop that controls here.

 The court notes that the Commonwealth has attempted to reinforce the facts in evidence in another way, namely by repeated references to the male on the bicycle as being an “Hispanic male.” The race of this person, which Detective McDonough believes he deduced from the person’s skin color, is mentioned repeatedly in the testimony of both detectives and is featured prominently in the Commonwealth’s memorandum in opposition to the defendants’ motions to suppress. The race of this individual has no relevance to this case, as his identity was never an issue. Indeed, the court is appalled that the Commonwealth would blatantly rely upon this person’s race in its listing of factual observations that it believes gave rise to probable cause to believe that a drug transaction took place. See Commonwealth’s Mem. at 4 (“Callahan had a short encounter with a Hispanic male on a bicycle”).

 It should be added that, given the quantity of drugs found and the locations where they were found, it is extremely unlikely that Callahan actually purchased the drugs from the male on the bicycle. Approximately 16 or 17 bags of heroin were discovered in various places in the car. Wherever these drugs came from, they most probably did not come from the male on the bicycle. This, of course, only undercuts McDonough’s belief that he had witnessed a drug transaction whereby Callahan purchased drugs, and supports the court’s conclusion that no probable cause existed at the time of the arrest to believe that Callahan had purchased drugs. Transcript at 50.

 Even if, as the Commonwealth also asserts, the purpose of the stop was simply to conduct a threshold inquiry and, therefore, the level of justification required was just reasonable suspicion, the court finds that not even this standard is satisfied. The facts in the possession of the officers merely give rise to a hunch that a drug transaction occurred. As has been stated, a mere hunch is not sufficient justification to stop a motor vehicle. Wren, 391 Mass. at 707. See also Commonwealth v. Lyons, 409 Mass. 16, 19 (1990).

 In light of the court’s analysis, the court need not decide when the arrests of Callahan and McNair took place. Whether the arrests took place (1) when Callahan and McNair were first read their Miranda rights or (2) after the drugs and other evidence were discovered, all evidence discovered by the police directly following the stop of the vehicle are “fruits of the poisonous tree.”