Agnes, Peter W., J.
This present controversy arises out of the arrest of the defendant, Angel Negron, on March 21, 2005 in Lawrence, Massachusetts for Trafficking in Cocaine in excess of 200 grams and Distribution of Cocaine. The defendant was arraigned on these charges in District Court on March 22, 2005. After proceedings in the district court which do not have a bearing on the present problem, he was indicted by the Essex County Grand Jury. On May 24, 2005, the defendant was arraigned before this court on four indictments charging him with these same violations. See G.L.c. 94C, §§32A and G.L.c. 94C, §§32E. Bail was set in the amount of one million dollars with surety or $100,000 cash. On that same day, a motion for return of seized property was filed by attorney Paul Farina on behalf of his client, the defendant Angel Negron, and Evelyn Lopez-Mercado who has offered to be the surety for the defendant (paper no. 5).
The defendant and Ms. Lopez-Mercado maintain that their rights were violated when the Massachusetts State Police seized the $100,000 cash on May 4, 2005 without a warrant and without probable cause while Ms. Lopez and others waited at the Essex County House of Correction and Jail at Middleton to post the cash as bail for the defendant. Following an eviden-tiaiy hearing, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
The investigation which led to the defendant’s arrest was led by Sergeant Canty and Trooper Masterson of the Massachusetts State Police who at the time were assigned to the Essex County Drug Task Force. The investigation also involved federal law enforcement agents including Special Agent Dowling of the Division of Homeland Security. They were investigating drug trafficking and bulk cash smuggling in the Lawrence, Massachusetts area.
During the investigation, Deputy Sheriff Shawn Richards of the Essex County Sheriffs Department, who also is assigned to the Essex County Drug Task Force, participated in surveillance of “controlled buys” involving the defendant Angel Negron. There were three completed controlled buys. The defendant was observed during the daytime hours on February 16, 2005 to leave 21 Wendell Street and drive without stopping to a location within several miles which Deputy Richards could not identify. The defendant was again observed during the daytime hours on February 24,2005 to leave 21 Wendell Street and drive without stopping to the “Plaza” described as on or near Broadway or Cross Street in Lawrence. The defendant was observed a third time during the daytime hours on March 11,2005 to leave 21 Wendell Street and drive several miles without stopping to a location which Deputy Richards could not identify.
The defendant was arrested on March 21, 2005 as he operated his motor vehicle and reportedly while on his way to complete another prearranged controlled buy. The police discovered a sophisticated, electronic “hide” or hidden compartment in the dashboard of the defendant’s car in which they found in excess of 14 grams of cocaine. Based on this discovery and other information, the police obtained a search warrant for 21 Wendell Street in Lawrence, Mass. The property consists of residential apartments and is owned by Sarah Lluberes (the principal putative surety in this case). She and the defendant were present at 21 Wendell Street during the execution of the search warrant. The police discovered a significant quantity of cocaine located in a bureau in the basement area of the building. They also found several picture identifications containing the photograph of the defendant under several different names. The police also discovered and opened a safe deposit box which contained another picture identification containing the defendant’s picture but a different name, along with what appeared to be female jeweliy. Both male and female clothing were found at the apartment. The officers gained entry to the basement by means of a key supplied by the defendant. Ms. Lluberes, as landlord of the premises, also had a key to the basement. Ms. Lluberes denied any knowledge of the existence of the drugs. She was not arrested at the time of the search, and has not been charged with any violations of the criminal law. She has not been identified as the target of any ongoing police investigation.
On May 3, 2005, the defendant was being held at the Middleton House of Correction under an order of the district court in lieu of bail in the amount of one million dollars with surety or $100,000 in cash. At approximately 7:30 p.m., two women, Evelyn Lopez Mercado and Sarah Lluberes, along with attorney Paul Farina arrived at the jail and advised the Sheriffs Department that they had $100,000 in cash (hereafter “the currency”) and wanted to post it as bail for the defendant. The Records Unit of the Sheriffs Department followed standard procedure by checking each putative surety to determine that she did not have a prior criminal record. There is no indication that these women did not qualify as sureties and therefore the court assumes that they met whatever criteria are used by jail officials for that purpose. The Sheriffs *598 Department also called First Assistant Clerk-Magistrate Robert Murphy who was the judicial officer assigned to handle out of court bails that evening.
When Murphy learned that the amount of the bail was $ 100,000 and that two women were at the jail with cash in that amount to post, he became suspicious about the source of the funds. He also had concerns about handling such a large amount of cash. He decided not to respond to the jail to conduct a hearing. Clerk Murphy suggested that the sureties go to the Lawrence District Court the following day and present the cash to the district court Clerk.
Murphy also contacted the Massachusetts State Police, informed them of the facts, including his suspicions, and stated that he would not be coming to the jail. The State Police indicated they would alert the District Attorney’s Office. The Sheriffs Department was aware that in addition to the bail order, the federal government had lodged an immigration detainer against the defendant and that even if bailed he would not be released from custody that evening. [1] On other occasions, Clerk Murphy has taken out of court bails involving amounts of cash in excess of $100,000. The three above-named individuals waited at the jail from 7:30 p.m. until about 11:00 p.m. before learning that there would be no bail hearing that evening.
On the following day, May 4, 2005, the two sureties did bring the currency to the Lawrence District Court and sought to post it as bail. However, they learned that the court had a policy against issuing process to bring a prisoner to the court for the sole purpose of having bail posted. Once again, the Records Unit at the Middleton Jail contacted Clerk Murphy and advised him of the situation. Clerk Murphy suggested that the sureties speak to the daytime bail commissioner, Manuel Dakos.[2] Clerk Murphy contacted Mr. Dakos, told him that there were several individuals with a large amount of cash who would be contacting him in an effort to post bail for the defendant, and advised him of the potential involvement of the state police.
Thereafter, Ms. Lopez-Mercado and Ms. Lluberes did speak to the daytime bail commissioner who told them to go back to the jail. Attorney Farina and the two women returned to the jail at approximately 12:00 noon in an effort to post bail for the defendant. Again, they brought the currency. There, they were met by Trooper Masterson and other members of the Essex County Drug Task Force. I find that Ms. Lluberes speaks some English although Spanish is her first language. She was able to converse with the police in English, but with limitations and was not always able to understand the police or to be understood. Ms. Mercado-Lopez does not speak English. Each of the women was cooperative with the police.
Ms. Mercado-Lopez had physical custody of the cash which was in a paper bag. Trooper Masterson does not speak Spanish. He communicated with Ms. Lopez-Mercado through a Spanish-speaking employee of the Sheriffs Department. It is impossible to assess the extent to which the suspicions harbored by the police about the source of the funds were heightened by the communications problems with the two women, but in assessing the totality of the circumstances it appears that the language barriers did adversely affect the ability of the two women to fully and completely answer the questions posed by the police. Each of these women had valid identifications. Ms. Lopez-Mercado had a Massachusetts driver’s license that gave an address of 117 South Broadway in Lawrence. This created suspicion in the mind of the police because Trooper Masterson was aware that the address was the location of a cellular phone store where the defendant had been observed in the past. However, it was later revealed that Ms. Lopez-Mercado owns that business.
Trooper Masterson questioned the two women about the source of such a large quantity of cash. Ms. Mercado-Lopez stated that $50,000 was contributed by Ms. Lluberes and $50,000 was raised by her (Ms. Lopez-Mercado) from friends. She explained that she lived at 59 Bromfield Street, apartment #2 in Lawrence and worked at the cellular phone business located at 117 South Broadway in Lawrence. See exhibits 4 & 5. She also stated that $6,000 had come from a person by the name of Luis Cassanova and $10,000 had come from another person by the name of Angel Rodriguez. She could not identify the individuals who had supplied the remaining $34,000 but offered to obtain the names and addresses of all the donors and report back to the police. Trooper Masterson also questioned Ms. Lluberes who he believed was the girlfriend of the defendant. She said that she knew Ms. Lopez-Mercado to be a friend of the defendant. She explained that she had raised $50,000 of the bail money by taking a loan secured by a mortgage on her home at 21 Wendell Street. She explained that with the assistance of an attorney, she had refinanced her home with Mr. Manuel Silva, a friend of Ms. Lopez-Mercado, who she thought was from Methuen, Massachusetts. She told the police she worked part-time at a 7/11 Store on Broadway in Lawrence. She had copies of the note and mortgage and a total of 17 pages of documents pertaining to the loan with her which bore the signature of her attorney, James Landy, Esq. She showed this paperwork to Trooper Masterson. See exhibit 2. When asked for Mr. Silva’s address, she provided Trooper Masterson with the address of 20 Willow Street in Lawrence not Methuen.[3] Trooper Masterson suspicions were heightened by the inability of Ms. Lluberes to answer questions about whether the loan documents had been recorded at the Registry of Deeds and concerns about whether the individual named Manuel Silva really existed. Additional evidence which came to light after May 4 supplies satisfactory answers to both questions.[4] Later investigation indicated that the loan and mortgage were recorded at the Registry of Deeds *599 on or shortly after May 4th. See Exhibit 3. At no time that day or thereafter did the state police contact Attorney Landy to inquire about the transaction or his role in it. Based on his (1) suspicions that Ms. Lluberes was involved in the defendant’s illegal drug activities because she appeared to be the defendant’s girlfriend and to live in the same building where the defendant lived and where in the basement a large quantity of cocaine was found, (2) a strong odor of cologne associated with the paper bag containing the currency, [5] (3) the failure of the two women to fully and completely answer questions about the source of the $100,000, and (4) a fear that if released on bail the defendant would flee the jurisdiction, Trooper Masterson seized the $100,000 cash that was the property of Ms. Lluberes and Ms. Lopez-Mercado. See exhibit 1, paragraph 7 (Report of Trooper Masterson).[6] When the police seized the currency, they removed it from the paper bag to count it in the presence of the two women and gave them a receipt. One portion consisted of $50,000 inside a white envelope in denominations of $100. This was described as the proceeds of the loan from Mr. Silva. The second portion consisted of $50,000 in smaller denominations (10s and 20s) that was inside a black plastic bag and wrapped in newspaper.
Trooper Masterson brought the currency to the Drug Task Force office and made arrangements for a detection exercise utilizing a drug sniffing dog assigned to Trooper Bazzinotti. The canine was certified in some fashion as a narcotics detection dog and had been involved in approximately 500 cases in which the police were attempting to locate illegal narcotics or the residue of narcotics. The office where the test occurred is a location where the police sometimes bring cocaine and other controlled substances that are involved in their investigations. The test consisted of laying the paper bag and the cash inside of it (all $100,000) on a table and inviting the drug sniffing dog to inspect it. The dog “alerted” to the presence of cocaine in the area of the paper bag and the money.
The following day, May 5,2005, Trooper Masterson and Special Agent Dowling visited Ms. Lopez-Mercado at her home. She provided the police with a Massachusetts Identification Card for Mr. Angel Rodriguez (one of the persons who she said had contributed funds for the bail money) and copies of some checks to Mr. Rodriguez. See exhibit 6. The police also learned that the correct address for Manuel Silva was Willow Street in Methuen and not Willow Street in Lawrence.
On May 31, 2005, Sergeant Canty and Special Agent Dowling went to Mr. Silva’s home and interviewed him. They met his daughter outside. She began to ciy when they informed her that they had reason to believe her father was involved in a criminal enterprise which involved a drug dealer. She brought the police to Mr. Silva’s apartment. Mr. Silva did not invite the police to enter, but he did not object to their entry because he was concerned that he should cooperate with law enforcement. Mr. Silva was cordial at all times and did his best to answer the questions put to him by the police. The questioning was intense and accusatory. I credit the account of this interview supplied by Mr. Silva who testified at the hearing. Mr. Silva’s first language is Portugese, but he speaks some Spanish and English. He was able to testify with the assistance of the court’s interpreter.
At the outset of the interview, the police told him that 21 Wendell Street — the collateral for his loan to Ms. Lluberes — had burned down. This was a purposely false statement designed to intimidate Mr. Silva. He owns both 18 and 20 Willow Street in Methuen where he has lived for more than 20 years. His daughter lives next door. He worked his whole life as a janitor until recently when he was laid off. He worked for the Raytheon Company and for his brother-in-law Joseph Silva. He has known Ms. Lluberes for over four years. He met her through his former girlfriend, Nilda Hernandez (phoenetic spelling) who babysits for his granddaughter. He sees Ms. Lluberes on a regular basis when he stops by the 7/11 store on Broadway in Lawrence for coffee. Nilda told him her girlfriend needed to borrow $50,000. Mr. Silva agreed to meet with her to discuss the request. He had no business dealings with Ms. Lluberes and had never loaned any money to her in the past. The three met at Nilda’s house on Harbor or Harvard Street in Lawrence. [7]
In one respect, I do not credit a portion of Mr. Silva’s testimony. He testified that he did not learn of the reason why Sarah Lluberes wanted the money (namely, to use to bail out her boyfriend) until after he made the loan to her. However, I credit the testimony of attorney Landy that this matter was discussed in the presence of Mr. Silva before the loan documents were executed. Before agreeing to make the loan, Mr. Silva examined the house that Ms. Lluberes proposed to use as collateral (21 Wendell Street, Lawrence)[8] and satisfied himself that it had a value that was sufficient to secure his loan above and beyond the obligation Ms. Lluberes owed to the first mortgagee. Mr. Silva met with attorney Landy on two occasions in connection with this transaction. First, to discuss the loan terms and prepare the documents, and thereafter to sign the documents. Mr. Silva withdrew $50,000 of his “hard earned money” from his bank on May 3,2005 and gave it in cash to Ms. Lluberes at Nilda’s home.[9] In the face of repeated questions suggesting that he was involved in a criminal enterprise and that the $50,000 offered as bail by Ms. Lluberes was the proceeds of illegal drug activity, Mr. Silva insisted it was his money and that he had earned it lawfully. Based on the credible evidence presented to me, I find that the Silva to Lluberes loan was what it was represented to be — an aboveboard loan that was not in violation of the laws.
Before the conclusion of the evidentiary hearing in this case, the Commonwealth, through the Assistant District Attorney, stated that the currency seized on *600 May 4, 2005 by the Massachusetts State Police had been turned over to agents of the United States on or about May 17, 2005 and sought to offer evidence in the form of documents under seal indicating that forfeiture proceedings had been initiated in federal court. The court ruled that it would not take any evidence that would not be available equally to the parties seeking the return of the property. The Commonwealth indicated that it could not submit any evidence regarding federal forfeiture proceedings other than on the terms outlined by the Assistant District Attorney. Accordingly the evidence portion of the proceeding was declared closed.
Thereafter, on June 17, 2005, the Commonwealth filed a “Motion to Supplement the Record.” The motion is allowed in part and denied in part. The court declines to consider the affidavits of Assistant District Attorney Hopwood, but will consider the affidavit of Stephen P. Leonard of the United States Customs and Border Protection agency dated June 16,2005 and the accompanying documents which indicate that the property that is the subject of this case — viz., the $100,000 cash — was seized by federal agents on May 17, 2005 and is allegedly subject to forfeiture under 21 U.S.C. §§881(a)(6) (proceeds traceable to illegal drugs) and 18 U.S.C. §§981(a)(1)(C) (proceeds traceable to smuggling).
RULINGS OF LAW
(A) Jurisdiction
(1)
Based on the facts that the $100,000 cash was seized by the police without a warrant, is not otherwise subject to judicial control by operation of a Massachusetts statute, was never received by the court as bail, and is currently the subject of a federal administrative forfeiture proceeding, this court lacks jurisdiction over the currency. Commonwealth v. Rufo, 429 Mass. 380, 383 (1999) (when the Massachusetts state police transferred to the federal Drug Enforcement Administration $38,692 found in a briefcase during an inventory search of a vehicle impounded after the defendant’s arrest for operating under the influence of alcohol and drugs and the federal agents initiated administrative forfeiture proceedings resulting in a declaration of forfeiture, the state court which had allowed the defendant’s motion to suppress based on an illegal inventory search lacked jurisdiction to then order the Massachusetts State Police to return the currency to the defendant).
[I]n tendering the property to the DEA for forfeiture, the police violated no law nor did they deprive the defendant of his right to the funds. The question of the defendant’s right to the funds was transferred to the Federal forum where, rightly or wrongly, the defendant lost. An order against the state police to pay the equivalent of the forfeited funds to the defendant would not be appropriate in this case.
Id. at 385. As Chief Judge Young observed in United States v. One Black 1999 Crown Victoria LX, 118 F.Sup.2d 115, 117 (D.Mass. 2000), “once a sovereign has assumed jurisdiction over ares, another sovereign will refrain from acting until compliance with the first sovereign’s orders.” In this case, Ms. Lopez-Mercado and Ms. Lluberes have the opportunity to challenge the forfeiture in a federal court and litigate issues relating to the warrantless seizure of the currency without probable cause and the lack of sufficient proof that the funds are the proceeds of illegal drug sales or smuggling activities.
(2)
The determination that this court lacks jurisdiction over the res, however, does not end our inquiry. The motion for the return of property raises a second fundamental question — did the Massachusetts state police unlawfully interfere with the integrity of the judicial process and the defendant’s interest in access to that process by seizing currency without a warrant that was brought to the jail to be deposited with a judicial officer as bail? An inquiry into these issues does not require this court to comment on the fairness of a federal forfeiture proceeding, and does not pose the risk of this court entering a judgment in conflict with the judgment that may enter in the federal forfeiture proceeding. See Commonwealth v. Rufo, 429 Mass. at 384 n.7.
In the present case, insofar as the Massachusetts State Police and others associated with the Essex County Drug Task Force seized the currency not only to obtain a share of the forfeited funds, but also to deny the defendant access to the judicial process, the outcome of the federal forfeiture proceeding, assuming it is contested, will not address this court’s interest in the integrity of its own judicial process, and may not discourage unlawful conduct of this sort in the future by state or local police. Cf. Selectmen of Framingham v. Municipal Court, City of Boston, 373 Mass. 783, 787 (1997) (considerations of judicial integrity require the court to apply the exclusionary rule in a civil proceeding to prohibit the government from taking advantage of its own law breaking in conducting an unlawful search to discharge the victim of the unlawful search from his job as a police officer). Constitutional safeguards against unlawful searches and seizures “should receive a liberal construction, so as to prevent stealthy encroachment upon or "gradual depreciation" of the rights secured by them, by imperceptible practice of courts or by well-intentioned but mistakenly overzealous executive officers." Gouled v. United States, 255 U.S. 298, 303-04 (1921). See also Commonwealth v. Sheppard, 387 Mass. 488, 517, 519 (1982) (Liacos, J., concurring).
The integrity of this Commonwealth’s judicial process is diminished when state law enforcement authorities seize the property of a Massachusetts citizen or resident without a warrant and without probable *601 cause in these circumstances. [10] These values when coupled with the public policy of the Commonwealth in favor of an individual’s right of access to bail out of court [11] demonstrate that much more is at stake in this case than who ultimately will control the currency.
One of the fundamental misconceptions exhibited by the police and the prosecution in this case, as illustrated more fully below, is that the manner and means employed by state or local officers to secure custody of property subject to forfeiture are not important so long as the government meets its burden of proving that the currency is contraband at the time the case is adjudicated. Forfeiture proceedings are in part punitive because they result in total loss of property. Commonwealth v. One 1972 Chevrolet Van, 385 Mass. 198, 201 (1982). And, it should not be overlooked that despite the frequency of forfeiture proceedings in association with the huge volume of drug cases that are brought into our District and Superior Courts, forfeiture has not been a favored remedy, see, e.g., United States v. One 1976 Mercedes Benz 280S, 618 F.2d 453, 454 (7th Cir. 1980); United States v. One 1981 Cadillac Eldorado, 535 F.Sup. 65, 67 (N.D.Ill.1982), and the laws pertaining to forfeiture should not be liberally construed.
When law enforcement authorities act unlawfully to seize property that is not per se illegal such as a vehicle or United States currency, it is universally accepted in both the federal system and in the states that the exclusionary rule is applicable. See One 1958 Plymouth Sedan v. Pennsylvania, 380 U.S. 693 (1965); Commonwealth v. Nine Hundred and Ninety-Two Dollars, 383 Mass. 764 (1981). See generally 1 Wayne LaFave, Search And Seizure §§1.7(a) at 220 n.6 (4th ed. Thomson/West 2004) (collecting cases). At a minimum, the application of the exclusionary rule deprives the government of evidence gathered after the illegal seizure, including the evidentiary value of the items that were seized, see United States v. $191,910.00 in United States Currency, 16 F.3d 1051 (1994), and may be grounds for the dismissal of the forfeiture proceedings. See Berkowitz v. United States, 340 F.2d 168 (1st Cir. 1968) (seizure of money from an individual without probable cause and without any other justification contravenes public policy and bars a subsequent forfeiture).
This case presents a compelling example of the need for a judicial declaration of rights and responsibilities because otherwise the state or local police may feel unconstrained to engage in violations of state law. It is an appropriate exercise of this court’s jurisdiction to fashion a remedy or to declare the rights of the parties in order to deter unlawful conduct. Compare Boston Housing Authority v. Guirola, 410 Mass. 820, 826 (1991) (observing that “the Supreme Court seems to be moving away from relying on the nature of the proceeding to determine whether the exclusionary rule applies and instead balances the deterrent benefits to be obtained from its application against the societal costs”).
Accordingly, this court will examine the conduct of the Massachusetts State Police and other local officers, as well as its own bailing officers, in connection with the efforts by Ms. Lopez-Mercado and Ms. Lluberes to post bail for the defendant.
(B) The Warrant Requirement
Massachusetts law explicitly commands the police to secure a warrant from a judicial officer before they may seize property for forfeiture. G.L.c. 94C, §§47(f)(l). Just as in the context of investigative seizures, the warrant requirement admits of exceptions. “Searches and seizures conducted outside the scope of valid warrants are presumed to be unreasonable. In such circumstances, the burden is on the Commonwealth to show that the search or seizure falls within a narrow class of permissible exceptions.” Commonwealth v. Rodriguez, 378 Mass. 296 (1979), citing Commonwealth v. Antobenedetto, 366 Mass. 51, 57 (1974). See also Katz v. United States, 389 U.S. 347, 357 (1967); Commonwealth v. Phillips, 413 Mass. 50, 55 (1992); Commonwealth v. Santaliz, 413 Mass. 238, 240 (1992); Commonwealth v. Forde, 367 Mass. 798, 800 (1975).
The purpose of the warrant requirement is to subject police suspicions that property is contraband or subject to forfeiture to the scrutiny of “a neutral and detached magistrate instead of [leaving them to be] judged by the officer engaged in the often competitive enterprise of ferreting out crime.” Johnson v. United States, 333 U.S. 10, 14 (1948). See Jenkins v. Chief Justice of the District Court 416 Mass. 221, 228 (1993) (“Beginning with the prohibition of ’unreasonable’ searches and seizures, art. 14 moves on to define the fundamental components of a constitutionally reasonable search or seizure: First, magistrates — rather than law enforcement agents — control the decision whether to effectuate a search and seizure, including the seizure or arrest of a person. Second, law enforcement agents bear the burden of justifying their intrusion into a person’s freedom by presenting the magistrate with sufficient grounds to support the search or the seizure.”).
The requirement of a warrant applies in cases in which the object of the seizure is forfeiture as well as in cases in which the police are motivated by the desire to gather evidence of a crime. [12] For example, in Commonwealth v. Brown, 426 Mass. 475, 480 (1998), the Supreme Judicial Court explained that the Massachusetts law provides two methods by which forfeiture proceedings may be commenced: either a civil action filed in the superior court in the nature of a proceeding in rem, G.L. 94C, §§47(d), or a motion in a related criminal case. G.L. 94C, §§47(b). The Supreme Judicial Court specifically rejected the argument that the owner of property subject to forfeiture loses any *602 expectation of privacy in it once it is seized by the police for forfeiture and the related claim that there is a search incident to forfeiture exception to the warrant requirement. See Commonwealth v. Agosto, 428 Mass. 31, 33-38 (1998) (under state statutory law, “the Commonwealth must show probable cause for an investigative search or for a forfeiture to a neutral magistrate who may then issue the proper search warrant or temporary orders relevant to forfeiture”). Apart from what rules may apply in the federal system; see Commonwealth v. Agosto, supra, 428 Mass. at 35 n.7, citing United States v. Pace, 898 F.2d 1218, 1245 (7th Cir.), cert. den. sub nom. Cialoni v. United States, 497 U.S. 878 (1990), and other cases; but see United States v. Lingenfelter, 997 F.2d 632, 640 (9th Cir. 1993) (“Seizures for the purpose of forfeiture are subject to the warrant requirement. Exigent circumstances, however, may excuse the failure to obtain a warrant.”); United States v. Pappas, 613 F.2d 324, 329-30 (1st Cir. 1980); Massachusetts law is unmistakably dear that judicial process is required to seize property for purposes of a forfeiture action unless a recognized exception to the warrant requirement exists. G.L.c. 94C, §§(f)(l)-[13]
The decision in Commonwealth v. Rufo, supra approves of the practice of state law enforcement authorities turning over seized property to federal agents for forfeiture under federal law. However, the Rufo decision neither declares nor implies that state law enforcement officers may disregard constitutional and statutoiy principles of Massachusetts law in seizing the property in the first place. See Commonwealth v. Agosto, supra 428 Mass. at 34 (“it is not the existence of probable cause itself that justifies an exception to the warrant requirement”; rather, probable cause supplies the basis for a warrant). See also Commonwealth ex rel. Parker v. Certain Lottery Tickets, 59 Mass. (5 Cush.) 369 (1850).
The Commonwealth also maintains that the police had a right to proceed without a warrant because there were exigent circumstances. This argument fails because if the police had not acted without a warrant, the currency would have been deposited with the court as bail and would have been available for seizure and forfeiture. Moreover, the police had ample time between the time when they were first made aware of the tender of the currency on May 3, 2005 and the time when they seized it without a warrant on May 4, 2005 to apply for a search warrant.
If, as the court believes, the primary concern that led the police to act without a warrant was a fear that it would lead to the release and default of the defendant, the claim of exigency fails for even more fundamental reasons. First, the evidence before the court is undisputed that the defendant would not be released if he made the bail because there is an immigration detainer lodged against him. Second, the police could have brought any concerns they might have to the attention of the District Attorney who could file a motion requesting that the defendant not be released despite the posting of the bail until the Superior Court conducts a hearing and inquires into the source of the funds and whether the posting of such money will reasonably insure the appearance of the defendant. See United States v. Nebbia 357 F.2d 303 (2d Cir. 1966). If the purpose of bail is to “assure the defendant’s appearance in court,” Commonwealth v. The Stuyvesant Insurance Co., 366 Mass. 611, 614 (1975), the court must have the power to inquire into the circumstances of any proffered bail and to consider whether there is evidence to suggest that the bail in question will not accomplish the purpose for which it was established. United States v. Nebbia supra 357 F.2d at 304-05. However, this is a judicial power and not simply a matter of executive discretion. See Commonwealth v. Lopez, Salem District Court No. 0536CR1095 (May 18, 2005) (Findings, Rulings and Order by Cometta, J.).
Thus, I do not believe the holding in Commonwealth v. Torres, Middlesex Superior Court No. 92-248 (February 19, 1993), upon which the government relies, is sound insofar as it indicates that the judicial officer who receives a tender of bail has no discretion to delay or stay an order of release of the defendant pending a judicial inquiry, and that when the police suspect that money offered by a third party to satisfy the defendant’s bail obligation is subject to forfeiture, they have a choice whether to employ the judicial process to secure it or to seize it without a warrant. [14] State law simply does not recognize any inherent Executive branch discretion to seize private property such as United States currency that is not contraband per se unconstrained by Article 14 of the Declaration of Rights and legislative restrictions such as G.L.c. 94C, §§47(f)(l).
(C) Probable Cause
(1)
Even though the failure to obtain a search warrant before seizing the currency violated Massachusetts law, the unlawful conduct of the State Police might not be as significant if in fact there was probable cause to seize it. Ordinarily, under the reasoning of Commonwealth v. Rufo, supra it would not be appropriate for this court to reach this question while the forfeiture proceeding was pending in a federal forum. Nonetheless, I do so not based on a lack of confidence in the fairness of the federal forfeiture proceeding nor in an effort to preempt the outcome of that case. As noted earlier, the adjudication of whether the currency is subject to forfeiture is entirely in the hands of federal authorities. However, the fact that the Massachusetts State Police acted without probable cause as well as without a warrant in seizing the currency amplifies this court’s concerns about the adverse impact police conduct like that involved in this case has on the integrity of the judicial process.
(2)
The Commonwealth maintains that the police may seize property which they suspect may be subject to forfeiture without a warrant and without probable cause so long as the government establishes that grounds exist *603 for forfeiture at the adjudication stage. [15] In other words, the police and the prosecutor in this case maintain that on the basis of a hunch or a suspicion, a person’s property may be confiscated and held while the police conduct an investigation in an effort to develop a basis for the forfeiture of the property. Such a rule would place the property of every citizen or resident at risk, especially those who live in or near areas of our Commonwealth where trafficking in illegal drugs is rampant. Fortunately, this is not the rule. See United States v. All Funds Presently on Deposit or Attempted to be Deposited in Any Accounts Maintained at American Express Bank, 813 F.Sup. 180, 186 (E.D.N.Y. 1993) (analyzing this precise question under federal forfeiture law and concluding that it is an “ancient lesson of Fourth Amendment jurisprudence . . . that the government may not validate unlawful searches through the information and evidence that the search subsequently uncovers,” concluding that Fourth Amendment requires the government must demonstrate probable cause at the time of the seizure), citing Whitely v. Warden, 401 U.S. 560,567 (1971); Bumper v. North Carolina, 391 U.S. 543, 548 n.10 (1968); Wong Sun v. United States, 371 U.S. 471, 484 (1963); Commonwealth v. Agosto, supra, 428 Mass. at 38. See also Berkowitz v. United States, 340 F.2d 168 (1st Cir. 1968) (seizure of money from an individual without probable cause and without any other justification contravenes public policy and bars a subsequent forfeiture).
(3)
Under Massachusetts law, probable cause for forfeiture requires a “demonstrable nexus” between drugs and the money or property seized. Commonwealth v. Seven Thousand Two Hundred Forty-Six Dollars, 404 Mass. 763, 765 (1989). See also Commonwealth v. Fourteen Thousand Two Hundred Dollars, 421 Mass. 1, 9 (1995) (defining probable cause in this context as “sound reason to believe that the money-drug nexus exists”). The standard applicable in federal proceedings is essentially the same. See United States v. One Lot of U.S. Currency ($36, 634), 103 F.3d 1048 (1st Cir. 1997); United States v. $250,000 in United States Currency, 808 F.2d 895 (1st Cir. 1987). See also United States v. $53,661.50, 613 F.Sup. 180 (S.D.Fla. 1985). Mere guesswork or conjecture that there is a nexus between property and illegal drug activity is not sufficient to justify the seizure of the money or to support its forfeiture. See Commonwealth v. Seven Thousand Two Hundred Forty-Six Dollars, supra, 404 Mass, at 766.
The facts in this case establish that when the Massachusetts State Police seized the currency on May 4, 2005 they acted on the basis of suspicion and hunches and not on the basis of probable cause.
(a)
With regard to the question of the source of the funds offered by Ms. Lopez-Mercado and Ms. Lluberes, at the time the police seized the currency they were aware that $50,000was the result of a second mortgage on the home owned by Ms. Lluberes and were presented with documentation that supported her explanation. It is certainly understandable that the police were suspicious that the home in question was tied to the defendant’s alleged drug dealing and that Ms. Lluberes herself was involved, but the information they possessed did not approach the level of articulable facts and circumstances that are required to establish probable cause. The mere fact that the defendant had traveled to the location of a controlled buy on three occasions from the location of 21 Wendell Street does not mean that the entire residential property was being used to facilitate criminal activity. Cf. Commonwealth v. Creek, 413 Mass. 492, 496-97 (1992). There is no evidence that living areas of the property in question were used as drug stashes, that the premises were used for the manufacture or packaging or processing of drugs, or that drugs were being sold throughout the premises. There is no evidence that a large volume of foot traffic was seen going in and out of the premises. Rather, the evidence was that a quantity of drugs was found in a bureau in the basement, an area that required use of a key to gain admission. See also Commonwealth v. Osorio, Norfolk Superior Court Indictment No. 107886 (August 4, 2000) (Doerfer, J.) (the fact that the defendant’s family raised funds for his bail is not particularly probative of a money-drug nexus; that view rests on the speculation that the money must come from criminal associates; the mere refusal of a surety to provide information about the source of funds does not contribute to the probable cause).
It also is apparent from the hearing in this case, that both Ms. Lluberes and particularly Ms. Lopez-Mercado had difficulty in communicating with the police when they were interviewed at the jail on May 3 and again on May 4, 2005.
(b)
With regard to the results of the drug-sniffing dog test, it is sufficient to point out that whatever the value of the information gained by this test, it cannot figure into the calculation of probable cause because it was learned after the unlawful, warrantless seizure. See Commonwealth v. Nine Hundred and Ninety-Two Dollars, 383 Mass. 764, 765 n.2 (1981) (noting that the exclusionaiy rule is fully applicable in forfeiture proceedings). Alternatively, even if the results of the test were considered, they are not significant enough, when considered along with all the other evidence, to establish probable cause. Moreover, when a drug dog is employed to sniff currency which is laid out on a table in an area in which other drugs are stored, even for brief periods of time following police investigations, such as the evidence in this case suggests, problems of cross-contamination cannot be ruled out. See generally United States v. Funds in the Amount of Thirty Thousand Six Hundred Seventy Dollars, 403 F.3d 448 (7th Cir. 2005) (surveying case law on cross-contamination in the context of drug sniff of currency).
*604 (c)
The prosecutor and police also point to the evidence that there was a strong odor of cologne emanating from the currency and/or the paper bag. Once again, that evidence is not probative of probable cause. There is no evidence that the defendant employed any masking agents with respect to the cocaine allegedly found in his vehicle or at 21 Wendell Street. It certainly gave the police grounds to suspect that the currency may contain trace amounts of an illegal drug, but without other evidence it adds nothing of value to the calculation of probable cause.
(d)
The final and, based on the findings of fact in this case, perhaps the most compelling reason why the police acted to seize the currency without a warrant was their fear that if it was allowed to be posted with the court it would result in the release and flight of the defendant. This consideration, however, is totally illegitimate. The police have every right to bring to the attention of a judicial officer information that may affect the court’s judgment about whether a person charged with a crime will appear, and to ask for an increase in the bail whenever there are changed circumstances. However, the police have no right to interfere with the right of the defendant or a family member or friend to post bail once it has been set by the court. As noted above, the police could have contacted the prosecutor who, in turn, could have requested a stay of the defendant’s release from the bail commissioner or from a trial or appellate judge who are on call 24 hours a day, seven days a week under the court’s Emergency Response System.
(D) The Remedy
(1)
The ultimate determination of whether grounds exist for the forfeiture of the currency is in the hands of the federal system. Based on the above findings of fact and rulings of law, the court concludes that the Massachusetts State Police assigned to the Essex County Drug Task Force acted unlawfully in seizing the currency without a warrant and without probable cause. The police should have sought relief from the court before making a warrantless seizure. The police should not have interfered with the defendant’s access and that of Ms. Llubers and Ms. Lopez-Mercado to the judicial process for release on bail. The bailing officer should have traveled to the Middleton Jail on May 3,2005 and conducted a hearing and exercised his judicial discretion independent of the interests of law enforcement.
In fashioning a remedy, this court is mindful of the observation by the Supreme Judicial Court in Commonwealth v. Hine, 393 Mass. 564, 573 (1984):
Basic to our conclusions in this and similar cases is that our courts should not adopt prophylactic remedies for police misconduct which needlessly frustrate law enforcement and the public interests in that sphere. Our emphasis has always been that any remedy should be tailored to cure the prejudice to the defendant . . . (J)udicial responses should be limited to truly remedial, and not punitive, measures, the absolute necessity for integrity in law enforcement recommends, in appropriate cases, recourse to civil remedies and departmental police discipline.
(2)
As stated previously, this court has no jurisdiction over the currency as long as forfeiture proceedings are pending in the federal system. Thus, the court is not permitted to order the return of the currency to Ms. Lluberes or Ms. Lopez-Mercado. There is no basis upon which to dismiss the indictments against the defendant because the charges themselves are not so tainted by misconduct so as to jeopardize the defendant’s right to a fair trial. Contrast, Commonwealth v. Manning, 373 Mass. 438,443-44 (1977). Since the basis for the original bail order of one million dollars with surety or $100,000 cash has not changed, Le., this court has not been presented with any evidence to suggest that as a result of the events described above the needed assurance that the defendant will appear for trial can be achieved by an order of release on personal recognizance or a lower bail. Thus, it would be arbitrary for this court to reduce the bail or order the defendant released on personal recognizance.
What is appropriate under the circumstances is (1) to afford the defendant an opportunity for a new bail hearing at which he may present evidence to suggest that a different order should be made, (2) to make a declaration with respect to the responsibilities that the police and the bail officers of this court should observe in similar circumstances in the future, and (3) to encourage the Commonwealth’s representative, the District Attorney for Essex County, to take appropriate steps to educate local and state law enforcement officers about their obligations under state law when property is seized that may be subject to forfeiture as set forth below in Principles One, Two, Three, and Four. [16]
(3)
Principle One
In cases in which state or local police, acting alone or in concert with federal authorities, believe that property in Massachusetts belonging to a person charged with a crime, a person who is a target of a police investigation, or an otherwise ordinary citizen or resident is subject to forfeiture, the police must obtain a search warrant or ex parte judicial process in accordance with G.L.c. 94C, §§(f)(l) and Article 14 of the Declaration of Rights of the Massachusetts Constitution before a seizure takes place unless the search or seizure falls under one of the recognized exceptions to the warrant requirement.
Principle Two
In cases in which state or local police, acting alone or in concert with federal authorities, believe that property *605 in Massachusetts belonging to a person charged with a crime, a person who is a target of a police investigation, or an otherwise ordinary citizen or resident is subject to forfeiture, exigent circumstances that may excuse the need to obtain a search warrant or other ex parte judicial process do not exist if, as in this case, the property is currency being offered to a judicial officer as bail. In a case such as this, the police must permit the currency to be deposited with the court. [17]
Principle Three
In cases in which state or local police, acting alone or in concert with federal authorities, believe that property in Massachusetts belonging to a person charged with a crime, a person who is a target of a police investigation, or an otherwise ordinary citizen or resident is subject to forfeiture, the police must have probable cause to believe that a nexus exists between the properly to be seized and illegal drug activity, as measured by the standards applicable under Article 14 of the Declaration of Rights of the Massachusetts Constitution and the Fourth Amendment to the United States Constitution, as well as any statutory standards such as those set fourth in G.L.c. 94C, §§47 before they may seize the properly for forfeiture.
Principle Four
When a defendant or other person inquires about posting bail or presents himself or herself during the daytime hours or after hours at a jail, a police lockup, or a courthouse for the purpose of depositing funds with the court for bail, the police are prohibited from interfering with the person’s right of access to the judge, clerk or bail commissioner.
Principle Five
When a request is made of a clerk-magistrate or other person authorized to receive bails by a defendant, a defendant’s family member, an attorney on behalf of a defendant or by the authorities holding the defendant to set bail or to receive bail, the judicial officer should respond promptly to the location where the defendant is being held and perform his or her judicial duties independent of the interests of law enforcement officials who may seek to forfeit funds offered for bail. In performing these duties, the judicial officer should not refuse to accept cash offered as bail because law enforcement officers suspect it is subject to forfeiture, but rather may segregate the cash apart from other bail money until further order of the court. If a request is made by the District Attorney that a defendant in custody who has posted sufficient bail not be released because there is probable cause to believe that the funds offered for bail are subj ect to forfeiture, the judicial officer may delay the release decision until such time as the case may be presented to a judge, but in no case later than the next sitting of the court.
Beyond these principles, it may be advisable for the Bail Administrator and the Superior Court Committee on Bail Practices to develop additional rules or policies regarding out of court bails involving large sums of United States currency.
ORDER
For the above reasons, the defendant’s motion for the return of seized property is DENIED WITHOUT PREJUDICE. In the event the federal forfeiture proceeding that is now pending regarding the currency in question does not result in an order of forfeiture, the motion may be renewed.
This court also recommends that the Office of the District Attorney take appropriate steps to bring these principles to the attention of the state or local law enforcement officials within its jurisdiction.

The evidence was that an “Immigration Detainer” would serve as a hold against a prisoner otherwise entitled to be released for 48 hours (exclusive of weekends) to give immigration authorities time to secure a warrant.

The daytime bail commissioner is empowered to receive bail at the jail during regular court hours while the Clerk-Magistrate and Assistant Clerks are performing other duties at the courthouses in Salem, Lawrence and Newbuiyport.

I find that the Mr. Silva’s address is 20 Willow Street in Methuen but that the paperwork identifies it as Lawrence because Attorney Landy was very familiar with Willow Street in Lawrence from other legal work and assumed that was the street referred to by Mr. Silva. There is no evidence that Ms. Lluberes was attempting to hide the true identity of Mr. Silva or to mislead the police.

First, Manuel Silva testified at length and was subject to cross-examination. I fully credit his testimony that he was asked to make a loan of money by his ex-girlfriend to help her friend Ms. Lluberes. He believed he was protected by the collateral supplied by Ms. Lluberes who pledged her interest in 21 Wendell Street. He knew the property in question and believed the equity owned by Ms. Lluberes was worth far more than $50,000.

Trooper Masterson believed that the odor of cologne contributed to the proof that the money was the product of illegal drug activity because in his experience drug dealers commonly used a strong smelling substance to mask the odor of the drugs. There is no evidence before me that any of the drugs seized from the defendant’s vehicle or from the bureau in the basement of 21 Wendell Street smelled of cologne. There is no evidence that the defendant or any known associate of his used this method of masking the odor of drugs. There is evidence that Ms. Lopez-Mercado’s cellular telephone store at 117 South Broadway in Lawrence sells cologne. While the police did employ a trained drug-sniffing dog who “alerted” to the money or the paper bag after it had been seized, see text infra, there is no evidence that any of the cash which has been in the custody of the police since May 4, 2005 has been subjected to any chemical tests that would reveal the presence of even trace amounts of cocaine residue. For these reasons, I do not attach significance to the opinion by Trooper Masterson that the odor of cologne was an incriminating factor.

Trooper Masterson testified that 21 Wendell was probably a “stash house” where the defendant stored his supply of illegal drugs. He acknowledged that sometimes a dealer lives in the same location where the supply of drugs is kept and sometimes not. The only evidence before the court is that the drugs seized from 21 Wendell Street were located in a bureau in the basement. If indeed that constituted the defendant’s “stash,” it does not point to the involvement of Ms. Lluberes in the absence of evidence of her knowledge or involvement in the defendant’s criminal activities, nor does it suggest that *606 the entire structure known as 21 Wendell Street was being used for criminal activity. There is no evidence that state or federal authorities have moved to forfeit the real estate in this case.

The witness had difficulty pronouncing and spelling the street, but I find that he knew exactly where Nilda’s home was located.

Mr. Silva knew of this particular home before the loan was proposed from prior experience in the neighborhood.

At the hearing, the prosecutor stated that the Commonwealth believed that no money actually changed hands between Mr. Silva and Ms. Lluberes, despite the note and mortgage, and that the entire arrangement was a cover to hide the use of cash by Ms. Lluberes which had been obtained from illegal activities. The Commonwealth subpoenaed Mr. Silva’s financial records. However, no evidence establishing or even pointing to such a fraud was offered.

At the argument in this case, the Assistant District Attorney conceded that Massachusetts law governed the determination of this case.

See Rules of the Superior Court, Rules Governing Persons Authorized to Take Bail, Rules 14 & 15 (1996) (providing that persons appointed or authorized to take bails must respond promptly to calls from the defendant or his or her family, attorneys, or custodians, and a plan must be in place to insure coverage of the entire jurisdiction). When the court has established an order of bail as in this case the defendant or a putative surety on his behalf who is prepared to tender United States currency to the court has a right to have access to a judicial officer unimpeded by police interference. Compare Commonwealth v. King, 429 Mass. 169, 174-76 (1999) (noting that a clerk-magistrate was not justified in refusing on public safety grounds to come to the police barracks to conduct a bail hearing). See also Commonwealth v. Rosewarne, 410 Mass. 53, 55-56(1991) (police violated rights of defendant in custody for operating under the influence of alcohol when they obstructed his efforts to secure his release on bail).

Hkewise, exceptions to the warrant requirement apply with equal force in each context. Thus, in Florida v. White, 526 U.S. 559 (1999), the Supreme Court relied on the automobile exception to the warrant requirement to sustain the warrantless seizure of an automobile for purposes of a forfeiture proceeding. The White case does not, however, stand for the proposition that warrants may be dispensed with in all cases in which property is seized by the police for forfeiture.

In Commonwealth v. Agosto, 428 Mass. 31, 38 (1998), the court found it unnecessary to reach the question whether Article 14 of the Declaration of Rights requires a warrant before property may be seized for forfeiture. It is important in the context of this case to appreciate that Article 14 was adopted to check the abuse of official power by Eighteenth Century British Crown officials who used the Writs of Assistance and General Warrants to conduct searches of locations and seizures of goods that they selected without the prior approval or scrutiny of a judicial officer, and without fear of civil suits exposing them to personal liability. See Jenkins v. Chief Justice of the District Court, 416 Mass. 221, 232-33 (1993) (citations omitted). It may be that the principle purpose of Article 14 and the Fourth Amendment to the United States Constitution was to establish limits against unreasonable searches and not to establish a preference for warrants. See Akhil Reed Amar, “The Fourth Amendment, Boston and the Writs of Assistance,” 30 Suffolk U.L.Rev. 53, 63-65 (1996). However, our modern jurisprudence has not developed a system whereby persons who are the victims of unreasonable searches and seizures have access to an effective civil remedy. Moreover, warrantless police detentions of persons, searches and seizures, especially in areas regarded as high crime locations, are a commonplace event in our society. Indeed, since there is no requirement that records be kept of the frequency and nature of warrantless police searches, their frequency is probably vastly underestimated. In the overwhelming majority of cases, the victims of unlawful searches and seizures are persons of low income without the means to mount civil suits to redress the violation of their constitutional rights. The demand for civil legal services for low income persons far outstrips the resources made available for that purpose. Instead, the judicially created exclusionary rule, as it is applied in criminal and quasi-criminal cases such as this, serves as the primary mechanism for the enforcement of the constitutional prohibitions against unreasonable searches and seizures. That development accounts for the modem doctrine whereby warrants are preferred. The fact that this preference may not be rooted in the history of Article 14 and the Fourth Amendment, does not make it illegitimate. A compelling case is made for the proposition that there should be a preference for a neutral and detached magistrate to stand between the police and the subjects of their searches and seizures, subject only to a limited number of carefully circumscribed exceptions, and that courts should require that judicial officers and not executive branch officials approve the process before the police undertake a search or seizure when contemporary circumstances are considered in light of the historical purpose of Article 14 and the Fourth Amendment. This is the policy adopted by the Legislature in G.L.c. 94C, §§0(1).

In fact, the holding in Nebbia, supra, a case on which the court relies in Commonwealth v. Torres, supra, is that release on bail is not automatic simply because the defendant or someone on his behalf posts United States currency in the amount of the bail. Nebbia, supra, 357 F.2d at 304-05. Moreover, in Commonwealth v. Torres, supra, the court overlooks the fact that the police and the prosecutor have access both to a trial judge and an appellate judge on a 24 hour a day, seven day a week basis under the Emergency Response System. If the police had allowed the currency in this case to be posted as bail, they could have sought an order from the bail commissioner, a trial judge or an appellate judge staying the defendant’s release until further order of the court. Because of the existence of the immigration detainer, there was no risk that the defendant would be released before a judge could conduct a hearing. See U.S. v. Ramos, 2002 WL 31031639 (D.Mass. 2002).

At the hearing, the prosecutor maintained that the standard for forfeiture under federal law is probable cause. In fact, federal and state forfeiture laws require the government to demonstrate that the res is the product of illegal activity by a preponderance of the evidence. See 18 U.S.C. §§983(c)(l); G.L.c. 94C, §§47(d).

It is not possible for this court to determine how widespread the practices followed by the police in this case may be, but it is significant to note that this court is aware that in the recent past, this problem has occurred in another case in the Superior Court and in a case pending in the Salem District Court. See Commonwealthv. Sanchez, ESCR2003-122 (Essex Superior Court); Commonwealth v. Lopez, Salem District Court No. 0536CR1095 (May 18, 2005) (Findings, Rulings and Order by Cornetta, J.). If the practice continues, a party who is prejudiced by such conduct has a right to apply to this court for injunctive relief.

In circumstances other than when United States currency is being deposited with a judicial officer as bail, the police may have the right to briefly detain the property or funds without a warrant and without probable cause on the basis of reasonable grounds to believe that criminal activity is taking place or is about to take place until such time as a warrant or judicial order may be obtained. See U.S. v. Ramos, 2002 WL 31031639 (D.Mass. 2002).